LONE STAR LIGNITE MINING CO. v. CADDELL et al.†

(Court of Civil Appeals of Texas. Jan. 19, 1911. On Motion for Rehearing, March 2, 1911.)

1. MASTER AND SERVANT (§ 118*)—INJURIES TO SERVANT.

Where the timber crew in a mine had commenced to brace the roof of one of the rooms, and while at work there a member of the track crew, whose duty it was to lay track and clear away obstructions, was killed by the caving in of the roof and deceased had nothing to do with the work of timbering or propping, the master was not absolved from liability under the rule as to the liability to servants who are engaged in the business of making safe an unsafe place.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 209; Dec. Dig. § 118.*]

2. MASTER AND SERVANT (§ 288*)—INJURIES TO SERVANT—ASSUMPTION OF RISK.

Where a servant employed in a mine knew that the roof of a certain room was considered probably dangerous, but he had been assured by his superior, who was an expert, that the roof was safe, and he was directed to proceed with his work, in an action for his death, owing to the fall of the roof, the question of assumption of risk was one for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1068–1088; Dec. Dig. § 288.*]

3. MASTER AND SERVANT (§ 289*)—INJURIES TO SERVANT—CONTRIBUTORY NEGLIGENCE.

The question of contributory negligence was one for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1089–1132; Dec. Dig. § 289.*]

4. MASTER AND SERVANT (§ 217*)—INJURIES TO SERVANT—ASSUMPTION OF RISK.

A servant, in order to be charged with an assumption of risk on the ground that he knows of the existence of the defect, must not only know of the situation, but also of the danger that is likely to result from it.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 574–600; Dec. Dig. § 217.*]

5. MASTER AND SERVANT (§ 270*)—INJURIES TO SERVANT—ACTION—EVIDENCE—ADMISSIBILITY.

In an action for the death of a miner owing to the caving in of the roof of one of the rooms in the mine, the negligence relied on was failure to exercise care in propping the roof of the mine so as to prevent caving in, and defendant interposed a general denial. A witness testified that in his opinion the caving could have been prevented had the timbering been done in time, and that in his opinion the timber crew was about six weeks or two months behind the miners with the timbering work, and he then testified, over the objection of defendant, that the space where the accident occurred could have been timbered in two or three days. Held, that the evidence was not inadmissible as against an objection that there were no allegations charging that defendant was behind with the timbering work, or that such negligence was the proximate cause of the injury, and that the testimony was irrelevant and immaterial.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 270.*]

6. WITNESSES (§ 379*)—IMPEACHMENT.

In an action for the death of a miner owing to the caving in of the roof of a room in the mine, a witness was asked if defendant's mine boss did not state that, if the owner of the mine had let the boss have had his way, the mine would have been sufficiently provided, and that deceased would not have been killed, to which he was permitted to reply in the affirmative over objection. Held, that the mine boss having testified on cross-examination that he had not made such statements, and having testified as an expert that the accident was the result of a general "squeeze" or movement of the earth, which could not have been prevented, the evidence was admissible for the purpose of impeaching the boss.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1209, 1220–1222, 1247–1256; Dec. Dig. § 379.*]

On Motion for Rehearing.

7. MASTER AND SERVANT (§ 278*)—INJURIES TO SERVANT—EVIDENCE.

In an action for the death of a miner owing to the caving in of the roof of a room in the mine, evidence held to warrant a finding that deceased was killed because of the unsafe condition of the place where he was at work, due to defendant's negligent failure to prop the roof.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 278.*]

Appeal from District Court, Hopkins County; R. L. Porter, Judge.

Action by Mrs. Lelia Caddell and another against the Lone Star Lignite Mining Company. From a judgment in favor of plaintiffs, defendant appeals. Affirmed.

Harry P. Lawther, for appellant. Templeton, Craddock, Crosby & Dinsmore, for appellees.

HODGES, J. In 1909 the appellant owned and was operating a lignite mine in Hopkins county, and on the 13th day of July of that

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

† Writ of error denied by Supreme Court.

year John Caddell, one of its employés, was killed while at work in the mine by the caving in of the earth from above. Appellees are the widow and child of Caddell, and bring this suit to recover damages sustained by reason of his death.

The negligence relied on as a ground of recovery is the failure of the appellant to furnish the deceased a safe place in which to work—the failure to exercise proper care in propping the roof of the mine so as to prevent its caving in while he was performing his duties. The testimony shows that the mine had been worked for some time, and considerable excavations made. It was divided up into compartments which the witnesses called "entries" and "rooms." One was designated as the "main entry," and the others by numbers, differing according to location. The employés consisted of the miners, who dug coal by the ton; the timber crew, whose duty it was to prop the roof of the mine as it was needed during the progress of the work; and the trackmen, who were employed to lay the track in the mine over which the coal was hauled, and to keep it clear of obstructions. J. A. Gray, a man of extended experience in mining, was the general foreman or mine boss, a man by the name of Warner was the foreman of the timber crew, and C. R. Cranford was the boss of the trackmen, and under him Caddell worked. The fall of the earth which caused the death of Caddell occurred in the eighth entry. The roof in this portion of the mine had not been propped. It is apparent from the testimony that propping the roof was not regarded as necessary till it began to slough off and fall. This condition did not necessarily indicate that the roof had become dangerous and unsafe, but that it would become so in the course of time if not properly supported. The roof in the eighth entry had been sloughing for several days, and the timber crew had commenced to brace it. On the day of the accident the falling of slate and earth in this place assumed such proportions that it became questionable whether or not the timber crew might with safety proceed with their work of supporting it. At the noon hour on the day Caddell was killed, Gray, the mine foreman, and Warner, the timber boss, went down into the mine for the purpose of making an inspection in this particular locality. Witnesses for the appellees testified that upon his return Gray told the employés, among whom was Caddell, that he had made an examination, and that the mine was safe, and directed them to go on with their work. This, however, is denied by Gray. About 1 o'clock p. m. on that day Caddell, together with Cranford, his immediate superior, Gray, and some employés, returned to the mine for the purpose of resuming work. When they reached the eighth entry, they found that the track at that place was covered with débris which had fallen

some time during the day; and Caddell, Cranford, and one other employé began to remove it. Gray and Warner were both present, and, according to witnesses who testified for appellant, Gray was making a further investigation of the condition of the roof by driving his chisel into it at various places, and sounding to see whether or not it was solid. While thus engaged, a crack appeared in the slate above, and, before the employés could get out of the way, a large quantity of earth fell, killing Caddell and partially burying another employé. Gray discovered the crack indicating that a fall was probable, and gave the warning, but too late for Caddell to escape.

The principal defense relied on in this appeal is that the rule of law making the master liable for a failure to furnish the servant a reasonably safe place in which to work has no application under the facts of this case. Complaint is made in the first group of assigned errors of the refusal of the court to give a peremptory instruction in favor of appellant, and in submitting to the jury the issue of negligence as a basis of liability. The proposition asserted is as follows: "The safe place rule does not apply where in a mine the workmen were engaged in timbering a dangerous place and had been temporarily stopped by the sloughing from the roof of such quantities of shale and slate as to make the continuation of the work appear dangerous, and, while the foreman was testing and inspecting the roof for the purpose of determining whether it was safe to go on with the timbering, it suddenly and without warning caved in and killed the servant." The principle of law invoked by counsel for appellant seems to have found its application in determining the master's duty with reference to those servants who are at the time engaged in the business of making safe a place that is unsafe, or those who, by reason of the fact that such work is being done, are put upon notice of an unsafe condition of the place in which to work. As to those servants who are engaged in repairing an unsafe place, the rule finds its rationale in the doctrine that the servant assumes the risks ordinarily incident to his employment, and that a danger existing by reason of the unsafe condition of the place is one of the necessary incidents to the service of making the place safe. After all, the rule rests upon the hypothesis that the danger is, or should be, known to the servant, and for that reason the risk is regarded as one which he assumes. 1 Labat, Master and Servant, §§ 29, 268. The argument of counsel for appellant upon the above proposition proceeds upon the assumption that Caddell was one of the servants engaged at that time in repairing the unsafe condition of the mine roof. The assumption is not justified by the facts. The business of propping the roof and preventing its caving was distinctly that of the timber

crew, of which Warner was the boss. Caddell was not a member of that crew, and it was no part of his business to assist in that work. He was a trackman, working under the supervision of another boss and in an entirely different department of the service. He was there upon that occasion, according to the testimony of witnesses for the appellees, for the purpose of performing a service in the line of his duty—that of removing obstructions from the track—and was not expected to take any part in propping up the roof. It cannot therefore be said that he was a servant engaged at the time in making safe an unsafe place. There was abundant evidence to support a finding by the jury that the appellant was guilty of negligence in not sooner placing props under the roof at this particular place. The testimony shows that the roof had been falling there for several days, and it seems to be conceded that when this condition arises, prudence dictated that it should be supported. The contention that Caddell assumed the risk of the dangerous condition of the place must rest upon the ground that it was a danger of which he knew. The proof shows that Caddell was an inexperienced man, and had been at work in the mine only a few months. He knew that the earth was falling at this particular place, and had, prior to the time he was injured, expressed some fear regarding its safety. But the testimony also shows that, after he had expressed those apprehensions, Gray, the mine boss and an expert in such matters, had assured him, together with other employés, that he had made an examination, and that it was safe, and had ordered them to return to work. Under that state of facts, we do not think it can be said that Caddell assumed the risk, or was guilty of contributory negligence as a matter of law. G., C. & S. F. Ry. Co. v. Duvall, 12 Tex. Civ. App. 348, 35 S. W. 700; Oil Mill Co. v. Farmer. 56 Tex. 301; T. & N. O. Ry. Co. v. Kelly, 98 Tex. 123, 80 S. W. 82; Id., 34 Tex. Civ. App. 21, 80 S. W. 1076; Shadford v. Railway Co., 121 Mich. 224, 80 N. W. 30; Commerce Milling & Grain Co. v. Gowan, 104 S. W. 916; Rowden v. Mining Co., 136 Mo. App. 376, 117 S. W. 695. The servant, in order to be charged with an assumption of the risk upon the ground that he knows of the existence of the defect. must not only know of the situation, but also of the danger that is likely to result from it. Rigsby v. Oil Well Supply Co., 115 Mo. App. 297, 91 S. W. 460; Railway Co. v. Jones, 77 Ark. 367, 92 S. W. 244, 4 L. R. A. (N. S.) 837; Robertson v. Hammond Packing Co., 115 Mo. App. 520, 91 S. W. 161; M., K. & T. Ry. Co. v. Dumas, 93 S. W. 493; 1 Labat, Master and Servant, § 296, and cases cited. Caddell may have known that the roof was sloughing off, and that it should be propped, but the jury had a right to conclude that he was not guilty of a want of proper care in relying upon the statements of an expert miner that the situation was not dangerous and that he might safely pursue his work at that place.

The fourth and fifth assignments of error complain of the admission of certain testimony which, it is claimed, was prejudicial to the appellant. The bill of exception shows that Davis, a witness for the appellees, had testified that in his opinion the timber crew was about six weeks or two months behind the "entry men" (probably meaning the miners) with the work of timbering the mine. The witness was then permitted, over the objection of counsel for appellant, to say that the space where the accident occurred could have been timbered in two or three days. The objection to this testimony was that there were no allegations in the petition charging that appellant was behind with the timbering, or that such negligence was the proximate cause of the injury, that the evidence showed that this entry was timbered to within a few feet of where the accident occurred, and the testimony objected to was irrelevant and immaterial. We do not think the objections were tenable. Appellant had by its general denial put in issue all the material facts alleged, necessarily including those upon which the appellees relied as charging appellant with negligence in not having timbered this entry. Davis had previously testified, without objection, that in his opinion this falling of the earth could have been prevented had the timbering been done in time. We think his answer which was admitted over the objection was relevant as tending to show that the appellant was negligent in not having done this sooner. Its relevancy was strengthened by the testimony of Gray, afterwards given, in which he stated that in his opinion the accident was the result of what the miners call a "squeeze"; that is, a sloughing of such proportions that no amount of timbering could have prevented it.

The third bill of exception shows an objection to the following question: "Q. I will ask you if Mr. Gray (appellant's mine boss) did not state to you in the conversation down there at the new mine that, if Mr. Watelsky (the owner) had let him have his way, he could have had the mine sufficiently provided, and that John Caddell would have been a live man to-day?" Objection was made to the witness' answering that question upon the ground that it appeared from the testimony that Gray at the time he is alleged to have made that statement was no longer in the employ of the appellant, and that appellant could not be bound by any admission or statement made by him under such circumstances; that the testimony was improper and incompetent, and not admissible even for purposes of impeachment. The objections were overruled by the court, and the witness answered, "Yes." The qualifica-

tion appended by the court to this bill ·of exception shows that this testimony was admitted after Gray had testified on cross-examination that he had not made such statements as those inquired about, and that this question and answer were permitted only for the purpose of impeaching Gray, and it was so stated by counsel for appellees in the presence of the jury. Gray had testified previously as an expert in such matters and had stated that the accident was the result of a general "squeeze" and extraordinary sloughing of the earth, which could not possibly have been prevented by any amount of timbering. His testimony would tend to show that Caddell was injured as the result of an inevitable accident, for which the appellant could not be held responsible. The effect of the statements attributed to him by Davis was to impeach Gray in that respect; and upon that issue at least we think the testimony of Davis was material and proper.

Finding no error in the judgment, it is accordingly affirmed.

### On Motion for Rehearing.

There are no just grounds for saying the jury was not warranted in reaching the following conclusions: (1) That the place where Caddell was working at the time of his death was unsafe, and that by reason of that condition he was killed; (2) that this unsafe condition was due to the failure on the part of the appellant to sooner prop the roof and prevent its falling; (3) that the failure of appellant to sooner prop the roof was due to its negligence. It is insisted, however, that Caddell knew of the unsafe condition of the roof, and, whether engaged in the work of making the place safe or not, he assumed the risk of any injury that might result from that condition. We can best answer the contention of counsel by quoting portions of the testimony upon which the jury might have relied in support of its conclusions.

Slayten, a witness for the appellee, in speaking of the débris which had fallen on the track in the eighth entry before the accident, stated: "I would guess that piece of rock or slate which fell to weigh between two and four tons. The employés of the company, not men working by the ton, were the ones that were taking this slate and stuff off of the track at the time of the accident. John Caddell and the man Daniels were both company men. The company men do this cleaning up of falls, and the diggers and drivers don't have help unless they are just a minded to. * * * Bob Cranford worked with John Caddell when they were not removing this falling stuff. They worked on the track, laying switches, tracks, etc. * * * After Mr. Gray went down in the mine to examine that place at noon, he came back, and said he thought we could go back to work all right that afternoon. We were supposed to start down in the mine to work at

about 15 minutes of 1 o'clock. I do not know exactly who was present when he told us to go back to work that afternoon. Several of the boys were there. John Caddell was there. * * * John was talking to me about that place while we were eating dinner, and before Mr. Gray said for all of us to go back to work. He said he rather thought the place was dangerous. John was helping remove this slate before dinner. I did not hear any one tell him to do this work. I did not hear Gray say anything directly to John when he was talking to us about going back to work. He was talking to all of us. * * * In my opinion, if this place had been propped, the fall would not have occurred. Mr. Cranford was with Mr. Gray when he came out of the mine that first time. He said he thought the place was all right,. and to go back and finish cleaning it up and get to work." Ed Duncan, a witness for the plaintiff, testified: "While we were at the top eating dinner, John Caddell said that, if he had not been sick and laying off, he would' not go back that afternoon. When Mr. Gray came up out of the mine, he said that he had examined the place, and thought it was perfectly safe. Told me to get the other driver to also pull in my place until we could get this place cleaned up. This was just before work time, and after John had said that about being sick. He said this in the presence of John Caddell. John Caddell and I went down to work at the same time. * * * Bob Cranford was the head trackman. Caddell was his helper. Head trackman attends to the main track. It is the duty of the company man that first finds any slate or stuff on the track to take it off. * * * Caddell was a trackman. It was a part of Caddell's duty as trackman to help take off this stuff. There was no timber at this place where he was killed. It was not propped. It was not safe without props there. Its condition was very bad, was arched out 7 or 8 feet high. If it had been properly timbered, it would have prevented this fall. It was liable to fall at any time when there was no timber there. When Mr. Gray came back up after his examination, he did, not say how he examined the place, but said it was perfectly safe and for us to go back to work."

C. R. Cranford, a witness for the defendant, and Caddell's immediate superior, testified: "At the place of this fall, shale or slate had fallen on the track. The roof where this stuff had fallen out looked to be good. The roof was then of rock. The slate had already fallen. * * * We went down there to sound around, and see if we thought the place was good and all right. When we went down there, I picked up a few chunks. of dirt or slate, and threw it off the track. Mr. Gray was sounding around. I do not know now what he used to sound the place with. * * * I have sounded the roof of mines. That roof sounded safe. I could hear-

the sound it made when Mr. Gray knocked on it. I do not believe he did anything except to sound the mine. I did not do anything. * * * I suppose there was a ton of this stuff that had fallen on the track, or maybe not so much; maybe only about 1,000 pounds. * * * We all got up to this fall in the eighth entry. Mr. Gray, Warner, Caddell, and myself were all throwing some of this fallen stuff off of the track. This was the fall where I had been with Mr. Gray that morning. Gray was there with us. If he was doing anything besides throwing this stuff off of the track, I did not notice him. * * * Nobody told me to pick up that slate. I do not know of anybody telling Caddell to pick it up. The reason I was picking this stuff off of the track was that, when I saw any stuff on the track, I went to work at removing it; considered it my place. Caddell and I did not go up there to clean track. We were on our way to get our tools. Nobody told me to stop and clean track before I got my tools. * * * When I got there to where this stuff was on the track, I stopped and started to throwing it off. I was at this place about three-quarters of an hour before this fell on Caddell. I did not notice anything that would indicate that this place would fall in. Did not see any sign, or did not notice any. They had timbered right up to the place of this fall. * * * I do not know how many times he (referring to Gray) knocked. I was watching him. I was picking up coal at the same time. I was within a few feet of him. * * * When he sounded, it sounded to me like it was safe and would not fall. You cannot tell always whether it is dangerous or not. Yes; it was dangerous without props. It did sound good. I cannot say whether I thought the place was dangerous without props at the time Mr. Gray and I were there inspecting it. Yes; I think it ought to have been propped. I expect it was dangerous without it. We were propping it before it fell. When Gray was sounding it there by me, it looked to be good, but I could not tell much about it. * * * When a fall occurs on the track, it is to the interest of the company to get it up off of the track as soon as possible, so as not to stop the operation of the cars. It is my opinion that it was my place to help do this. Yes; I was helping there, because I think it was my duty. Yes; John Caddell was doing that. Yes; I understand it was a part of his duty as well as mine to help pick up that stuff. Yes; he was under my supervision and under Mr. Gray's at the time he was doing this work. Yes; and where Mr. Gray and myself could both see him. Yes; I considered it my duty to do this work when it was needed. Yes; it was my helper's duty also. Yes; John Caddell was actually engaged in helping clean this track at the time he was killed."

A. L. Daniels, a witness for the appellant, testified: "After we got down in the mine, Mr. Gray or Mr. Warner, one, I could not say which, told us to get this place cleaned up so we could go to hauling coal, and, while we were at work, there one of them hollered, 'Look out, this place is dangerous!' And I did not know anything else. I do not know that Caddell said anything down there. I did not see Caddell that morning. * * * This happened so quick that I knew nothing about it until it was on me. It happened in a second or two after somebody hollered 'Look out!' [This witness was injured at the same time and by the same fall that caused the death of Caddell.] When I got back from dinner and had gotten to the scales, Bob Cranford was there, and said that Mr. Gray was back there, and to come on back and go to work. I do not remember whether he said Mr. Gray said it was safe or not. My best recollection is that he said that Mr. Warner and Gray said that it was all right, and for us to come back and go to work. Cannot say whether Mr. Gray said it or not. * * * He said the place was all right. * * * John Caddell was there at the time he told us this."

J. A. Gray, the appellant's mine boss, testified: "It is hardly ever the case that a whole mine is timbered. Sometimes we find a rotten or faulty roof, and then we timber it. When it commences to slough off, then it should be timbered. When a roof sounds drummy and begins to slough off, then they go to timbering it." In speaking of the roof at the place where the fall occurred, Gray testified: "It sounded solid, but would keep on flecking off. Was the most peculiar place I ever saw. When a place sounds solid, it does not fleck off, but this place sounded solid and flecked off at the same time. That flecking is usually accompanied by a drummy sound. I did not know what to think. We then went back out of the mine for dinner." Again he says: "And there were places in the mine that seemed to need timbering worse than that place did. I went to timbering there as soon as Warner reported. When I was tapping and examining this roof, I did not expect it would fall until after I discovered the crack. When I saw the crack and thought the place was going to fall, I hollered for the men to look out, and for everybody to get back. * * * I suppose it had been flecking at the place of the accident some three or four days. I do not know that I thought about timbering the whole place when I saw this flecking. * * * I did not decide it all needed timbering until the day before the accident. * * * The reason I did not keep on timbering right on up to the accident is because the roof was too low, and we had to wait for it to slough off. That is the only reason. * * * This place was in uncertainty; yes. Was in uncertainty probably three days prior to the accident; noticed it had been falling more than it was in the habit of. I did not get anxious, but got interested, and wanted to see what

was the matter. Yes; I decided that place needed timbering that day before the accident. Yes; I decided it was dangerous. * * * I did not know at the time whether the place was safe or unsafe. I had not formed a definite opinion at that time. I knew it was uncertain. I did not warn a man then. I did not know any were there. I told Warner at the top that I was going down ahead of them, and see if the place was sound and all right; that I had examined it that morning and it sounded solid, but was the most peculiar place I had ever seen; and that I was going to make a thorough examination before the men got back to work. I did not direct them not to go back to work. * * * I do not know that I told Charley Davis, at the new mine, that, if Watelsky had let me done as I wished, the mine would have been fixed up in better shape, and that Caddell would have been alive to-day. * * * I remember being asked some question like that in Como. Some one in the crowd answered that, if I had had my way, I would have had the mine fixed up, and that if Watelsky had let me do as I wanted to that John Caddell would have been alive to-day, and then turned to me and asked me if that was not true. I said it might be possible. Did not say I had been to Watelsky several times for hands and timber to fix up this mine, or this place. * * * A man who had only worked in the mines could not tell from looking at a roof that had begun to fleck whether or not it was dangerous. That is sometimes a difficult matter for an experienced man. Must be a man of some experience to know this; must have some knowledge of the formation of the earth, and know how to make the test. * * * Right at this particular place where Caddell was killed it had been flecking, I suppose, about three or four days. Flecked something like a half a ton I suppose. That was that draw slate I was speaking of. It was an ordinary occurrence for this draw slate to fleck off. Yes; sometimes after this flecks off the blue shale above will stand all right without any props. Yes; we had stopped timbering close to the place of the accident about a week before the accident. Started up again the afternoon before the accident. * * * We had stopped at this place because it had not fallen out high enough to be timbered, and also it did not seem to need it."

Walter Slusher testified for the appellees: "I remember Mr. Gray coming out of the mine just as I finished dinner. I had already finished eating. I was sitting around the shaft. I remember him saying he had been down and found it all right, he thought. John Caddell was sitting right past me at the time. He was talking to all of us there, I suppose."

The foregoing testimony establishes the following facts: That at the time Caddell was killed he was at work in the performance of his duty, and at a place where he was expected and known to be; that he had been previously assured by his superior, who was an expert in such business, that the mine roof was safe and that he might proceed with his work, and was directed to do so; that danger of the roof's falling was not so imminent and threatening as to justify the conclusion that he was guilty of contributory negligence as a matter of law in exposing himself in the manner he did.

If these conclusions be correct, then we can see no reason for changing the disposition previously made of the case, and the motion for rehearing is overruled.