# Ellis's Administrator v. Louisville, Henderson & St. Louis Railway Company.

(Decided November 13, 1913).

## Appeal from Meade Circuit Court.

1.   Railroads—Action for Damages for Death of Flagman—Negligence of Flagman.—When a flagman is sent out to watch for trains and

warn them of danger, the railroad company and its trainmen have a right to presume that he will not only watch for trains, but also for his own safety, and his failure to do this is his own negligence, and he cannot recover of the company for an injury which he received by reason of his neglect, unless his presence and peril were discovered by those in charge of the train in time to avoid striking him, by the exercise of ordinary care.

2.   Railroads—Death of Flagman—Negligence of Flagman—Facts Stated.—Appellant's decedent, a flagman, was sent out by appellee to keep a lookout for trains during the time that its track had been damaged by rains and storms and while it was being repaired. He was run over by a train and killed, but it not being shown that he was in a helpless condition when he was discovered on the track, and there being no proof of any negligent act, or omission of duty on the part of those in charge of the train, the lower court properly directed a verdict for the railroad company.

3.   Railroads—Employers' Liability Act.—If one's death is · caused solely by his own negligence he cannot recover under either the state law or the Federal Employers' Liability Act.

POPHAM, TRUSTY & ROOSE for appellant.

FRANK C. MALIN, J. R. SKILLMAN and R. A. MILLER for appellee.

Opinion of the Court by Judge Nunn—Affirming.

Harmon Ellis was killed by one of appellee's freight trains at 8:30 o'clock on the morning of July 18, 1912. His administrator sues for damages, and at the conclusion of his evidence the lower court directed the jury to find a verdict for the defendant railroad.

The accident occurred at a season of damaging storms and rains, and appellee's track and bridge crews were being worked overtime repairing the damage. A crew was at work repairing a bridge at or near Lodiburg Station, and flagmen were stationed at proper distances east and west of the bridge to warn approaching trains of the construction work at the bridge. Ellis had said to his assistant foreman that morning as they were preparing to leave for work, "I have got a kind of a crick or crook in my neck, and he said, if I knew that I wouldn't get to flag today, he said, I would go home, and I said to him, come go on out, we are going to put in some timber and there will be some flagging to do, and you have been flagging, and I suppose you will get to do it this morning."

Ellis got on the hand car and went to the place of work with the bridge crew. Reaching there, he was sent by the foreman a proper distance west of the bridge to flag trains. The train which struck and killed him was a west bound freight of 23 cars, 18 of which were loaded. It was signaled by the flagman east of the bridge, and safely crossed the bridge. There was a private road crossing about a quarter of a mile west of the bridge, and for which the statutory signals were given. A quarter of a mile still further west, about midway of a curve and cut, Ellis was struck by the train and killed. From the bridge west, the train was going down grade over a moist track. Appellant claims that at the time and place of the accident, the appellee owed the decedent the duty of keeping a lookout, and giving reasonable warning of the approach of the train; that the employees in charge of the train discovered the peril of the decedent in time to stop before striking him by the exercise of ordinary care; and that the decedent had worked for the appellee continuously for more than sixteen hours out of the twenty-four just preceding the accident, and by reason thereof was in an exhausted physical condition, and unfit for service. Insisting that the railroad negligently failed in these duties to decedent, the appellant contends that the railroad should respond in damages, and that the lower court erred in directing a verdict otherwise.

From the evidence in this case Ellis was a flagman with the duty to keep a lookout for trains, and it is difficult to conceive upon what basis appellant contends that trainmen should keep a lookout for him. While it was Ellis's duty to flag east bound trains, that is, trains approaching the bridge from the west, still to properly perform his duties he should have kept alert and awake so that even if upon the track he could have removed himself from danger of a train although coming from the other direction. When a flagman is sent out to watch for trains and warn them of danger, the company and its trainmen have a right to presume that he will not only watch for trains, but also for his own safety, and his failure to do this is his own negligence, and he cannot recover of the company for an injury which he received by reason of his neglect, unless his presence and peril were discovered by those in charge of the train in time to avoid striking him, by the exercise of ordinary care.

Conniff v. L. & N. R. Co., 124 Ky., 763; Wickham v.
L. & N. R. Co., 135 Ky., 288; L. & N. R. R. Co. v.
Hunt, 142 Ky,, 778.

Did those in charge of the train discover Ellis's peril
in time to stop the train by the exercise of ordinary care?
As above stated, the train was a heavy one going down
grade over a moist track, and its speed is estimated by
the witnesses at from 18 to 25 miles per hour. There
is absolutely no proof to show his position upon the
track, that is, whether sitting or standing, or whether
or not he was asleep. The fireman did not see him at
all, and there is only circumstantial evidence that he
was seen by the engineer, and this evidence was given
by three witnesses. One of them, Mr. R. T. Payne, a
farmer owning adjacent land, testifies that he was in a
cornfield approximately 150 yards west of the place of
accident, and 100 yards north of the railroad track; that
he heard the train sound the road crossing signal, and
that when it got to about the head of the cut, it sounded
distress signals, and continued to sound whistle signals
until the train was stopped. Several weeks later he went
to the place with other parties, and located about where
he remembered the place of accident, and the place
where the distress signal was first sounded, and the dis-
tance between the two places was stepped, and was 200
yards.

Mr. Hardin another member of the party says the
distance was 15 rail lengths, and he estimates the length
of a rail at from 30 to 32 feet.

It will be seen that according to Payne's testimony
the distance was about 600 feet, and according to Har-
din from 450 to 480 feet. Both witnesses swear that they
could stand at the head of the cut and see a man lying
on the track at the place about where Payne understands
Ellis was killed. The fact that the distress signals were
sounded is evidence that the engineer saw Ellis on the
track, but whether the engineer at the same time dis-
covered him in a helpless condition, or in a perilous
situation does not appear.

Another witness, Swink, says he was working in his
blacksmith shop, and that after the train passed Lodi-
burg, he first heard a natural whistle, evidently the road
crossing signal, and in a short time he heard a different
whistle, and this whistling continued about a half min-
ute. This last whistling evidently included the distress

whistles, and the long blasts to the men in the caboose, for aid, which the proof shows were given.

The fireman, Newton, was shovelling coal into the firebox, and could not see ahead. The first intimation he had of danger was the sounding of the distress whistle and immediately he felt the application of the emergency brakes. Witness Payne corroborates Newton in the fact that the distress whistle and the application of the brakes were simultaneous, for Payne swears that he noticed the train began to run slower as soon as he heard the whistle. Newton thought they were running into a land slide, and going to his place on the left side of the engine, he looked ahead, but saw nothing, and the engineer said "we have knocked a man off the track."

In the direction the train was going the track curved to the left, and although witnesses Payne and Hardin were able to see a man lying on the track, where they think Ellis was killed, from their position at the head of the cut, it is not clear that the engineer from his position on the right of the engine could have seen him at that point, for the nose of the engine extending perhaps 12 or 15 feet must necessarily have obstructed his view of a left curving track. This does not mean that the engineer did not see him when Payne first heard the whistling signals, but it does indicate that when the whistling began the engine was even closer to Ellis than the 600 feet point estimated by Payne.

Assuming that the train was running at the lowest estimated rate of speed, viz.: 18 miles per hour, in a half minute it would run 792 feet. After striking Ellis it stopped four or five cars less than the length of the train. Appellant introduces some witnesses who testify as experts, that a train running at 18 miles per hour could have been stopped at 400 feet, but these witnesses were not acquainted with this track or train, and knew nothing of the curve or grade, and it is not clear how much variation there would be in their estimates in view of the down grade and the wet condition of the track at the time and place of this accident. Considering this proof most favorably to appellant, we have a range and distance of from 50 to 200 feet to spare, and less than a quarter of a minute in which it is claimed the engineer might by the exercise of ordinary care have stopped his train, and averted the accident. But these calculations and estimates should be made from the time his help-

less condition was discovered, not necessarily his presence. Since it is not shown that Ellis was in a helpless condition when he was discovered on the track, and there is no proof of any negligent act or omission of duty on the part of any of those in charge of the train, we are convinced the lower court properly directed a verdict for the railroad.

It remains only to consider whether the facts bring this case within the purview of the Federal Employers Liability Act, or the Sixteen Hour Law. The only witness who testifies on his time of service is Mr. LaGrand. The effect of his testimony is that Ellis had not been in the continuous service of appellant for as many as sixteen hours during the 24 hours preceding the accident. If one's death is caused solely by his own negligence he cannot recover under either the state law or the Federal Employers Liability Act.

For the reasons indicated the judgment is affirmed.