### 8109.   SOUTHERN RAILWAY CO. *v.* BLACKWELL.

1. The suit was brought under the Federal employer's liability act, but not on account of any violation of the Federal statute for the protection of employees; and hence the doctrine of assumption of risk was available as a complete defense; and no presumption of negligence existed against the defendant.
2. The plaintiff was a section-hand in the employ of the defendant and was injured while carrying on the work he was engaged to perform, and the uncontradicted evidence showed no want of ordinary care on the part of the defendant for his safety. The verdict was not warranted by the evidence.

DECIDED JULY 26, 1917.

Action for damages; from Whitfield superior court—Judge Fite. September 1, 1916.

*Maddox, McCamy & Shumate, George G. Glenn,* for plaintiffs in error. *W. E. Mann, W. C. Martin,* contra.

WADE, C. J.   Gyp Blackwell instituted an action against the Southern Railway Company for personal injuries.   The action was brought under the Federal "employer's liability act" of April 22, 1908 (c. 149, 35 Stat. 65, U. S. Comp. St. 1916, §§ 8657-8665). The allegations of the petition were substantially as follows:   That on September 21, 1914, while the plaintiff was in the employment of the defendant as a section-hand, and at work on the "Dalton section," the foreman who had charge of the work, and whose orders he was bound to obey, directed him to obtain from the section tool-house in Dalton, Georgia, a certain "slag buggy" belonging to the defendant, and to proceed down the defendant's railroad-track with it; that the "slag buggy" is a two-wheel contrivance, which runs on one of the rails of the railroad-track, and is pushed by any one propelling it; that it was to be carried south, and the plaintiff was pushing it in that direction as ordered by his foreman, and his face was towards that direction and he was in a bent or stooping position, performing his work and duties as directed by the foreman, and had advanced about one mile south of Dalton, when a passenger-train of the defendant ran down upon him, and, as he was attempting to get out of the way of the train, it struck the "slag buggy" which he was pushing, and knocked it with great violence against him, breaking his leg and causing other injuries described.   It was further alleged, that it was the custom of the section-hands to go out at 6:30 o'clock a. m., and this fact was known to defendant, its servants, agents, and employees; that the defendant was negligent in running the train at the high and rapid rate of sixty miles per hour "at the point and along the place where employees were expected at this time in the morning, and where in the exercise of ordinary care they could have seen petitioner," and in not keeping a lookout at this point, as ordinary care and diligence required, and in failing to see him, as the engineer and fireman of the train would have done had they exercised ordinary care; and in not having the train under such control as to avoid injuring him, and in failing to warn him of the approach of the train, by blowing the whistle or ringing the bell; that if the engineer and other servants of the defendant had exercised ordinary care and diligence, they could have seen that the plaintiff was in a stooped and bent position, with his back towards them, and that the only way of escape from this perilous position was by

warning from the employees in charge of the train. The plaintiff further alleged, by amendment, that the defendant was negligent in that its section foreman failed to place some one in charge of him to help with the "slag buggy," and in failing to notify "the operator" and have him provide means to warn the plaintiff of the approach of the train, and provide for his protection. The verdict was in favor of the plaintiff, the defendant's motion for a new trial was overruled, and the movant excepted. Counsel for the plaintiff in error, in their brief, say: "The sole insistence that will be made in this brief is upon the general grounds of the motion for a new trial, we believing that, under the undisputed testimony in the case, plaintiff was injured by one of the risks assumed by him in undertaking defendant's employment; that no negligence is shown whatever upon the part of the defendant's agents; and that there can be no legal recovery by plaintiff."

The action being brought under the Federal employer's liability act, the provisions of that act are controlling, and the case must be adjudicated in accordance therewith. It is well settled that under the provisions of this act the plaintiff assumed whatever risks were normally incident to his employment. "In a suit brought under the Federal 'employer's liability act,' except generally as to violations of Federal statutes for the protection of employees, assumption of risk is an absolute defense, while contributory negligence merely reduces the damages. Roberts, Injuries to Interstate Employees, § 103; Seaboard Air-Line Ry. *v.* Horton, 233 U. S. 492 (34 Sup. Ct. 635, 58 L. ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475)." *Charleston &c. Ry. Co.* v. *Sylvester*, 17 *Ga. App.* 85 (86 S. E. 275). One of the risks assumed by the plaintiff in this case (who was employed as a track-hand), upon entering the service of the railway company, was the danger ordinarily incident to the usual and proper operation of its trains over the track upon which he was at work. This proposition is the fundamental principle underlying the decision of the Supreme Court in the case of *L. & N. Railroad Co.* v. *Kemp*, 140 *Ga.* 657 (79 S. E. 558). In that case the injured employee was foreman of a force of section-hands in charge of a section of the defendant's railroad. His duties required him to inspect and maintain the tracks and roadway upon his section. While on a tour of inspection of the tracks he was confronted with an emergency produced by the sud-

den appearance of a freight-train, operated in the usual method, which rounded a curve, and in an effort to remove from the track the hand-car on which he was riding, and avoid the impending danger to himself and his hand-car, he was injured. It was expressly ruled in that case that under this state of facts the plaintiff could not recover.

To justify a recovery for injury caused by a train striking a section-hand while engaged in repairing a track, it must be shown that the proximate cause of his injury was the railway company's neglect of some duty due to him in respect to his protection from injury by passing trains. Upon this subject, it was said in the case of Norfolk &c. Ry. Co. v. Gesswine, 144 Fed. 56 (75 C. C. A. 214): "This man was one of a number of men who were employed as section-men on the railroad. They were engaged in repairing the track, taking out rails, putting in new ones, taking out cross-ties and putting in new ones, and hewing them into proper form and shape, and were working on the railroad-track, while the trains were being operated in the usual way—manifestly, a place of danger. A railroad does not suspend the operation of its trains until the track can be put in order, and the proposition to these section-men was, 'We will run the trains and operate the road as heretofore, as we ordinarily do, and between trains you must do this work and look out for yourselves to avoid being injured by the trains,' and the section-men accepted the employment upon those terms, and, if an accident occurs and they are hurt while the trains are being managed and operated in the usual and ordinary way, they can have no just ground of complaint against the railroad, it is not the fault of the railway company." See also Aerkfetz v. Humphreys, 145 U. S. 418 (12 Sup. Ct. 835, 36 L. ed. 758); Morris v. Boston & Maine Rd., 184 Mass. 368 (68 N. E. 680). In the case of Woods v. St. Louis &c. R. Co., 187 S. W. 11, the Supreme Court of Missouri said: "It is not the duty of a railroad company to notify section-men that any certain trains are expected to pass over the road, but it is their duty to be on the lookout and keep out of the way." And in the case of Ellis v. Louisville &c. Railway Co., 155 Ky. 745 (160 S. W. 512), it was held: "When a flagman is sent out to watch for trains and warn them of danger, the railroad company and its trainmen have a right to presume that he will not only watch for trains, but also

for his own safety, and his failure to do this is his own negligence, and he can not recover of the company for an injury which he received by reason of his neglect, unless his presence and peril were discovered by those in charge of the train in time to avoid striking him, by the exercise of ordinary care."

Applying the above-stated principle of law to the facts adduced at the trial in this case, we are constrained to set the verdict in favor of the plaintiff aside. The plaintiff himself testified: "Number 8 was scheduled here at 6:30 in the morning at the time I was hurt. I had been seeing No. 8 pass every morning since I had been working in this section. It was a passenger-train. I was told that No. 8 was scheduled to pass Dalton at 6:30 in the morning. We always got down to our work before No. 8 passed here. On the morning that I was hurt I knew that No. 8 had not passed. I knew that while on my way down to my work that No. 8 was coming along sometime or another. . . I knew when I left here that if No. 8 had not run I couldn't walk down to my work before it was due along on its schedule. I knew it would pass me between here and where I would stop work." He further testified that all he was "paying attention to was getting out of the way, and I won't say whether he [the engineer] blew or not. I couldn't tell you whether this train slacked speed or not. I did not pay much attention to the train." J. D. Anderson, a witness sworn in behalf of the plaintiff, testified: "I went down to the place where the plaintiff was injured on the Southern road this morning. From the place that was pointed out to me as the place where the plaintiff was hurt, if the engineer had seen the boy as quick as he rounded the curve he could have seen the boy something like one hundred yards, the distance of nine rails, and they told me they were 33 feet long. There is a boulder that projects out from that hill going around that curve on the west, but I couldn't tell you how far that boulder is from the track. . . . You can see further around the curve from the outside rail than you can from the inside rail. As the engineer was sitting on the inside of the curve next to the boulder, Gyp could have seen the other side of the engine a little sooner than the engineer could have seen him. Had the boy been looking, I think he could have seen the engine a little bit sooner than the engineer could have seen him. From where Gyp showed me where he was hurt it was nine rails and one

half from where the engineer came around the boulder." C. A. Rivers, sworn in behalf of the defendant, testified: that he was a foreman for the Southern Railway Company on the section south of Dalton; that he remembered the morning Gyp Blackwell was hurt; that he had a "slag car" that he wanted brought down to where he was going to work, a mile and a half south of Dalton, and that he "left Gyp to bring it down and told him to keep a lookout for No. 8, which was a passenger-train;" that he "told Gyp to bring the car down to where we were dressing slag;" and also told him (Gyp) that "he had 19 minutes on No. 8 when he left Dalton." On cross-examination this witness said, that he "knew the curves were in the track down there," and that the train was coming around those curves; that he "instructed Gyp to watch out for the train and keep out of the way;" that he of course knew that "the train would be running schedule speed along there, which was about 30 or 35 miles per hour;" that he "did not notify the operator to put the engineer on notice that the car would be down in there somewhere,—that wasn't my duty and I didn't do it." R. L. Haire, sworn for the defendant, testified that he had been operating an engine on the Southern Railway continuously for 26 years, and that he "was running the engine that hit the buggy, that buggy that morning;" that he knew the place where the buggy was struck, and at that "place there is a very stiff curve, it is about as stiff a curve as we have on the road;" that there is a "rock boulder on the right-hand side going south, and on the left-hand side is a little fill, and this is a stiff curve, and that mountain comes down to where you can't see around there;" that he was sitting on the right-hand side of the engine, and "that is the side this boulder is on, going south along there. This boulder is higher than I am on the engine, and obstructs my view, and I can't see until I pass around it;" that he thought "this boy could have seen the front end of the engine quicker than I could have seen him on the track, because of coming around the curve. The engine is 55 feet long and I was 30 feet behind the front end of the engine, and he could have seen the front end a second or two before I could have seen him;" that when he struck this slag car he thought he was running about 40 miles an hour, which was just about the usual rate of speed—about schedule time; that when he went around that curve he was looking ahead and

saw this boy as soon as he passed around the rock boulder; that he could not have seen the boy any sooner than he did; that just as soon as he passed around this rock boulder on the curve there, he saw the boy pushing this "slag buggy" ahead, and that he shut the engine off and grabbed the whistle and pulled it open and grabbed the brake valve with the other hand, and "the boy, just as soon as he heard the whistle, just tumbled off, just like that, with the buggy. . . There was no doubt in the world about my having blown the whistle, I remember that as distinctly as I do I am sitting here now. As a railroad man with my experience, I say there was nothing more that I could have done that I did not do—I did everything that was possible."

There was no presumption of negligence against the defendant in this case, and it will be observed that under the testimony of the plaintiff himself, as well as of the witnesses sworn in his behalf, and from the uncontradicted evidence in behalf of the defendant, the defendant's employees in charge of the locomotive and cars which injured the plaintiff used all ordinary care and diligence to avoid the injury. The plaintiff not only knew that this particular train which caused his injuries was due to pass that place about the time it did pass, but was expressly warned by his foreman that "he had 19 minutes on No. 8 when he left Dalton, . . to watch out for the train and keep out of the way." The undisputed evidence shows that there was absolutely no way the engineer in charge of the defendant's train could, in the exercise of the degree of care required by law, have known of the presence of the plaintiff on the track. There was a sharp curve in the track, just before the train reached the place where the injury occurred, which prevented the trainmen from seeing the plaintiff in time to avoid the accident. When the engine came around the curve it was running at the usual rate of speed, which was about 40 miles per hour, but, due to its close proximity to the boy, it was impossible to stop it in time to prevent striking him. However, the whistle was blown and the brakes were applied. In fact, when the emergency arose, the employees of the defendant did everything in their power to avoid injuring the plaintiff.

The contention that the foreman was negligent in failing to go to the station, near which the accident occurred, and notify the agent in charge of the station, so that on arrival of the train at

the station he in turn might notify the engineer of the train that the plaintiff was somewhere down the track, and to look out for him, is without any substantial merit. Granting, for the sake of the argument only, that it was the duty of the foreman to see that the engineer in charge of the train was notified of the plaintiff's presence on the track, such notice would not have availed him anything, since the uncontradicted evidence shows that the train was properly and carefully operated, and that the employees in charge of it wree not guilty of any negligence whatever.

In Cincinnati etc. Ry. Co. *v.* Jones, 171 Ky. 11 (186 S. W. 807), it was held: "Ordinarily trainmen do not owe any duty to keep a lookout, to give signals of approach, or to reduce speed of trains in anticipation that employees engaged in repairing the tracks may be found upon the tracks, as they may assume that the track repairers will be on the lookout and get out of the way, and as to such employees owe the duty of exercising ordinary care to prevent injuring them only when they are discovered in situations of danger." Had the foreman actually notified the engineer in charge of the train that the plaintiff was at work on the track only a short distance ahead of the tiain, the engineer would still have had a perfect right to assume that the plaintiff would be on the lookout to protect himself, and consequently would not have been guilty of any negligence whatever in acting upon this assumption and operating his train accordingly.

The injuries received by the plaintiff were the result of negligence on his own part, and were in no way brought about by negligence upon the part of others; and the railway company, as appears from the evidence adduced at the trial, being free from all negligence, is likewise free from liability.

*Judgment reversed. George and Luke, JJ., concur.*