## Louisville & Nashville Railroad Company v. Seeley's Administrator.

(Decided April 26, 1918.)

### Appeal from Laurel Circuit Court.

1. Master and Servant—Railroads—Lookout for Watchman.—The servants of the railroad company who have charge of and are operating a train are under no duty to maintain a lookout ahead on the track for a watchman of the company, who is sent out to patrol the tracks and lookout for obstructions and warn trains of danger.

2. Master and Servant—Railroads—Lookout for Watchman—Duty of Watchman.—It is the duty of the watchman patrolling the tracks of the railroad company to maintain a lookout for passing trains, and not the duty of the trainmen to maintain a lookout for the watchman.

3. Master and Servant—Railroads—Lookout for Watchman.—As the trainmen owe the watchman no duty to maintain a lookout for him or to give signals of the train's approach, if injured he can not recover unless it be made to appear that the trainmen discovered his peril long enough before the injury to have, by the exercise of ordinary care, avoided striking him, and failed to do so.

GEORGE G. BROCK, H. J. JOHNSON and BENJAMIN D. WARFIELD for appellant.

HAZELWOOD & JOHNSON for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Reversing.

This action by the administrator of Elmer Seeley against the Louisville & Nashville Railroad Company, was instituted in the Laurel circuit court on the 4th of April, 1914, to recover for the death of Seeley under the federal act. The deceased was only a little more than eighteen years of age at the time of the accident and his death. He was a citizen of Laurel county but the accident happened in Pendleton county on the main line of the Louisville & Nashville Railroad from Cincinnati to the south, and the train which struck and killed him was engaged in interstate commerce. Seeley had been engaged as a section hand by the railroad for only a few days before his death, and on the afternoon before the night on which he was struck and killed he had been engaged at his regular employment, tamping ties. While thus engaged he was notified by the foreman that he and another man by the name of Ledford, an acquaintance of Seeley, would be required to patrol a certain section of the track that night and watch for slides or slips from the mountain side on to the track, and in case of such accident remove the slide if possible, and if not, signal the train and call a sufficient force to remove the obstruction. The distance to be patrolled was something near a mile and was between the mountain and Licking river, and very close to each. About dark that night Seeley and Ledford were provided with two white lanterns and one red lantern, a shovel, each, and other implements and were sent to perform the patrol duty. They went to what they thought was the middle of the distance to be patrolled and there built a fire as the night was cold and wet. Ledford agreed to patrol the south end of the track from the fire, and Seeley the north end. Accordingly they started out, each on his part of the beat, carrying a lantern and tools, and made a round trip inspecting the track and looking out for trains. In about thirty minutes they met again at the fire and after warming a while made a second trip, and so on through the night up to about twelve o'clock. About midnight they were at the fire warming and again decided it was time to make another trip, and Ledford started on his south course, and, as he says, Seeley on his north trip. In the usual course Ledford returned to the starting point at the fire, and on approaching that point he observed Seeley seated or hunkered down on the south bound track

in about two or three feet of the fire, his head down, and a train from the north, running at the usual rate, approaching and in about thirty or forty feet of Seeley. At this time Ledford was about fifteen or twenty feet distance from Seeley and shouted a warning to him to which Seeley gave no heed, and seeing his great peril, Ledford undertook to snatch Seeley from the track and jumped to do so, but as he reached him the train struck Seeley and threw both men into the air, inflicting injuries upon Seeley from which he shortly thereafter died. The train, a double-header, passed on without stopping, and it is in evidence that the crew did not know of the injury and death of Seeley until it reached Cynthiana, some thirty miles distant. Before the night of the injury the railroad company had experienced more or less trouble with slides on the track near the point in question, and had frequently placed patrols there to watch for obstructions and to warn trains of the approach in case one came. However, this was the first night on which the deceased, or Ledford, had been called upon to perform this patrol duty. The train crew knew the fact that slides frequently interfered with the passage of trains at that point, and that persons were frequently there, especially in rainy bad weather, such as the night in question, to patrol the track and warn approaching trains in case of an obstruction on the track. Whether Seeley was asleep at the time of his injury is not certain, neither do we know whether he had made a round trip upon his beat at the time Ledford made his last round trip, because it is stated by Ledford that Seeley was sitting hunkered down apparently asleep when he first saw him on approaching the fire; and further that on former trips they had arrived at the common meeting point about the same time.

It is manifest from the evidence that no one upon either of the engines in the freight train which struck Seeley saw or knew of the presence of Seeley on the track at the time or before his injury; it was a dark night; the fire built by Ledford and Seeley was blazing up fairly well at the time Ledford left it to go on his trip, which occupied about twenty or thirty minutes, and was yet blazing and giving off more or less light upon his return at the time of the accident.

Upon these facts the appellee, administrator of Seeley, insists that it was the duty of the railroad com-

pany and its servants, in charge of the train which struck and killed the deceased, to keep a lookout ahead for persons upon the track at the point where the watchmen were to be reasonably expected on the night in question, and to exercise ordinary care to avoid injury to the patrols, including Seeley, and this view was adopted by the trial court in its instructions to the jury, and this is the chief complaint of the railroad company upon this appeal. However, this is not the only complaint made, the others being (1), that the petition, as amended, does not state a cause of action; (2) the court erred in rejecting competent evidence for the defendant and admitting incompetent evidence for the plaintiff; (3) the evidence does not support the award of damages to the appellee for the deprivation of pecuniary benefits, and especially that awarded to the mother.

The jury returned a verdict for two thousand dollars, of which one thousand was awarded to the father, and one thousand to the mother of Seeley. In connection with the complaint that the court improperly instructed the jury, it is earnestly insisted by appellant that the jury should have been peremptorily instructed to find and return a verdict for it. As the plaintiff rests his right of recovery largely, if not entirely, upon the duty of the persons in charge of the train, to maintain a lookout ahead for Seeley and others who might be upon the track at the point of the injury, it follows logically that if this duty did not devolve upon the company and its servants in charge of the train, then a peremptory instruction should have been given unless there had been evidence for the plaintiff showing, or tending to show, that the danger to, or peril of Seeley was discovered by those in charge of the train before his injury and in time to have avoided the injury. There can be no negligence without a corresponding duty. In other words, negligence is the antithesis of duty.

Where a watchman is set at a given point on the track to look out for trains and to warn them of danger from obstructions, or where a watchman is placed at a crossing or other place for the purpose of warning persons or vehicles of the approach of trains, it is the duty of such watchman to keep a constant lookout for approaching trains, and to avoid coming in contact with them. Frequently it is held that a watchman must be aware all the time of the running of trains over the track

on which he is at work. Even if those in charge of a fast train knew a watchman was working at a given point, or might reasonably be expected to be working there, the train crew must also know it to be the duty of the watchman to maintain a clear track for that train, and to himself keep out of its way. C. N. O. & T. P. Ry. Co. v. Harrod's Admr., 132 Ky. 445.

In the Harrod case the question was asked, would the speed of a train, through neglect as to passengers or licensee, be negligence as to the watchman? And the court said: "We think not, and it would make no difference whether they were in the yard at Georgetown, at Kincaid, or in the country where there was no station; for it must always be borne in mind that negligence toward a person is the antithesis of the duty owing to that person." Again this court in the case of Ellis' Admr. v. L. H. & St. L. Railroad Co., 155 Ky. 745, recognizes the rule that "When a flagman is sent out to watch for trains and warn them of danger the company and its trainmen have a right to presume that he will not only watch for trains, but also for his own safety, and his failure to do this is his own negligence, and he can not recover of the company for an injury which he received by reason of his neglect, unless his presence and peril were discovered by those in charge of the train in time to avoid striking him, by the exercise of ordinary care. Condiff v. L. & N. R. Co., 124 Ky. 753; Wickham v. L. & N. R. Co., 135 Ky. 288; L. & N. R. Co. v. Hunt, 142 Ky. 778."

From this is would seem that the trainmen in charge of the engine which struck Seeley were under no duty to maintain a lookout for Seeley, and if they did not discover his peril in time to avoid injury to him by the exercise of ordinary care, the company is not liable.

The appellee to support his contention that the railroad company owed deceased the duty of maintaining a lookout for him and of giving him warning of the approach of the train which ran against him, cites the case of L. & N. Ry. Co. v. Lowe, 118 Ky. 260, and a number of other cases of like character wherein an employe was injured by a passing train in a railroad yard, or other place where a number of persons were employed and where the presence of persons upon the track was reasonably to be anticipated by those operating the train, and in each case this court correctly held that a lookout duty was incumbent on the engineman. But the facts in this case do not bring it within the rule there recognized.

In the Lowe case as well as all the others, except the Smith case, cited by appellee, the injured person was not a watchman whose duty it was to lookout for trains and avoid coming in contact with them. But they were engaged in other employment which occupied their attention, and which did not require them to keep a constant lookout for trains, and furthermore, were on the track at a point used so generally and continuously by numerous persons, which fact was so well known to those in charge of the trains as to cast upon the trainmen the duty of maintaining a lookout for persons on the track at that point.

The case of C. N. O. & T. P. Ry. Co. v. Smith's Admr., relied upon by appellee as sustaining their position, is very much unlike the case at bar in its facts. While it is true that Smith came to his death while upon duty as watchman, it must be remembered that he was stationed at a place where a number of men were working on the tracks day and night, and where the presence of persons upon the track was reasonably to be anticipated by the train crew; that he was standing under large torches used by the construction gang to light their work; not only this, but his red light as well as white light was setting in the middle of the track and was run over by the train which struck and killed Smith; and further, that the engineer and fireman who testified in the Smith case, in explaining how they failed to see the red light on the track, said that they were easing by a large boulder which the crew had blasted off the cut and which lay very close to the track, and in doing so the engineer was not looking ahead but was looking back so as to get the signal of the man who was standing near the boulder to warn the engineer in case the steps of the train were about to strike the boulder, and that the fireman was not maintaining a lookout because he was at that moment putting coal into the fire box, and this, too, although they were approaching the point at which it was their duty by reason of the number of men employed thereabouts to maintain a constant lookout ahead upon the track.

Another case relied upon by appellee is L. & N. Railroad Co. v. Johnson's Admr., 161 Ky. 824. Johnson was a trackman and not a watchman, and was employed with from three to five hundred other men in and about the yards of the company in south Louisville, where there was a great number of tracks, and the frequent passing

of trains. As in the Smith case the men thus employed in large numbers were reasonably to be anticipated upon the tracks by those in charge of the engine, and that being true the duty of maintaining a lookout ahead and to give timely warning was incumbent upon the trainmen.

The case of McCalley's Admr. v. C. N. O. & T. P. Ry. Co., 169 Ky. 47, is also distinguishable from the case under consideration. McCalley was engaged by the railroad to remove cinders from the track at a water station, and was engaged at this work when the fast train, running at a high speed, suddenly came up behind him, knocking him some sixty feet through the air, breaking his neck and killing him instantly. There was no warning of the approach of the train, and he was not a watchman. In that case the court held that a servant of the railroad company whose duties are not to lookout or have to know of the schedule of trains, but whose duties are to engage in labor upon the track, is entitled to warnings of the approach of trains and a lookout from the ones operating the trains. This was upon the hypothesis that the employment of McCalley did not require him to lookout for trains.

A distinction may be also easily made between the case of the Louisville and Interurban Railway Company against Kirk's Admr., 175 Ky. 588, and the case at bar. Kirk was a boy about sixteen years of age who with a large concourse of people, including a great number of children, was on a picnic in a suburb of Louisville. The interurban cars carried the picnickers to the church at which the picnic was to be had. The children were running and playing on, over and across the tracks of the company, and the motorman in charge of the car which ran over and killed Kirk had just passed the church and saw the children and surrounding conditions. He drove his car to the end of the line, which was only a short distance, and returned over the same line by way of the church where he had just a few minutes before saw the children playing on and over the tracks and, without stopping, operated the car at a high rate of speed, thus killing young Kirk, and the company was held liable. This judgment, however, was upheld on the idea that the persons in charge of the interurban car had knowledge of the presence of persons upon the track, or so near to it as to be endangered by the car, or that they had knowledge of such facts as would cause reasonably

prudent men to expect persons upon the track and to therefore anticipate their presence and to keep a lookout for them.

In the case at bar Seeley's duty to the company and to himself was (1) to lookout for trains and, (2) to clear the tracks in case he had opportunity to do so. It would be unreasonable and, indeed, a thing unheard of to require a railroad company when it sends out a watchman to flag a train or to warn approaching trains, to send a second man to watch the first one and to warn him of the approach of trains. However, if this could be expected and required, the second watchman would be in just as great need of a third watchman as was the first of the second, and so on *ad infinitum.*

Under the facts as presented to the trial court, we conclude that the motion for peremptory instruction should have been sustained. There can be no recovery in this case, unless it be made to appear that the train crew discovered Seeley upon the track apparently unconscious of and oblivious to the approach of the train long enough before the accident, by the exercise of ordinary care and the employment of the means at hand, to have averted the accident and failed to do so. The train crew did not owe Seeley a lookout duty. Having reached this conclusion we consider it unnecessary to discuss the other questions presented.

Judgment reversed for proceedings consistent with this opinion.