## 10257.  SOUTHERN RAILWAY COMPANY *v.* SIMMONS.

1. The petition set out a cause of action, and was not subject to general demurrer.
2. The suit was brought under the Federal "employer's liability act," but not on account of any violation of the Federal statutes for the protection of employees. Thus, the doctrine of assumption of risk was available as a complete defense, since an employee assumes the ordinary risks and hazards of his occupation, and also those risks which are known to him, or which are plainly observable, even though due to the master's negligence; and no presumption of negligence existed against the defendant.

3. The plaintiff was a section-hand in the employ of the defendant, and was injured while engaged in the work which he was employed to perform. The uncontradicted evidence shows that, as to the acts of negligence charged, the defendant used all ordinary care for the plaintiff's safety, unless it be that the foreman was negligent in ordering him to remove the lever-car at the time and place he did; and even though the defendant was negligent in this respect, such negligence was known to the plaintiff and was plainly observable. He therefore assumed the risk occasioned thereby, and can not recover.

DECIDED JULY 17, 1919.

Action for damages; from Habersham superior court—Judge J. B. Jones.  November 3, 1918.

Seaborn Simmons brought an action against the Southern Railway Company for personal injuries, under the Federal "employer's liability act" of April 22, 1908 (c. 149, 35 Stat. 65, U. S. Comp. St. 1916, §§ 8657-8665). The petition alleges, substantially, that on February 11, 1918, while engaged by the defendant as a section-hand, the plaintiff was working for the defendant under the direction and control of Dalton Lovell, section foreman, who was in full charge of the section of the defendant's line of road known as the "Baldwin section;" that the plaintiff was directed by Lovell to assist the remainder of the crew in propelling a lever-car belonging to the defendant, which was being used to transport the section-crew and their foreman from Baldwin, Ga., to Cornelia, Ga., for the purpose of repairing the tracks of the defendant's line of railroad; that when the plaintiff was on the car helping to propel it, and had traveled about half the distance from Baldwin to Cornelia, one of the defendant's passenger-trains came around a sharp curve, running at great speed, some 50 or 60 miles per hour, on the main track that the lever-car was on; that when Lovell saw the train coming he ordered the section-crew to remove the lever-car from the track; which they undertook to do, but, on account of the nearness of the train and the great speed at which it was being run, they were unable to remove the car in time to prevent the train from striking it; that when the plaintiff saw that the train was going to strike the car, he undertook to get to a place of safety, but the train struck the car and knocked it from the track and against him, breaking his leg and causing other injuries described. It was further alleged, that the defendant had a double track from Baldwin to Cornelia, and an agent at its station at Baldwin whose duty it was to know when trains were due to

7

arrive, and that it was the duty of Lovell, the foreman, to ascertain from the station-agent at Baldwin, before starting with the lever-car, if any train was due to arrive, and which track it would be on. It is alleged that the defendant was negligent in the following respects: (1) in running the lever-car on the same track that it was using at the time for its passenger-trains at this point; (2) in ordering the plaintiff to remove the lever-car from the track, as the train was so close to it; (3) in not warning the plaintiff of the approach of the train, in running the train at such a great rate of speed, in not stopping the train, and in knocking the lever-car from the track and against the plaintiff; (4) in not using the other track for the lever-car, as the defendant knew that the passenger-train was on the track at that time and place, and that it was obviously dangerous to operate the lever-car on that track. It is further alleged that the plaintiff was without fault and in the exercise of ordinary care for his own safety, and could not have avoided the consequences of the defendant's negligence by the exercise of ordinary diligence after the negligence of the defendant became apparent; that he did not know of the approach of the train in time to prevent the injuries, and could not have found out about the acts of negligence by the exercise of ordinary care; that it was no part of his duty to look out for trains, but this was the duty of Lovell, the foreman.

On the trial of the case it was admitted that both the plaintiff and the defendant were engaged in interstate commerce at the time of the alleged injury. The plaintiff himself testified: "I had been working with Lovell ever since the last of October,—October, November, December, and January. You catch trains on the double track day and night, all the time, plenty of them. . . They generally run by schedule; they run passenger-trains on schedule. I have known one to be late. I know that was late that morning. I thought it was due, thought number 36 [the train which struck the lever-car] was due. I didn't know it. I didn't know about the second 36. I knew they ran extra freight-trains there sometimes. I have seen trains of all kinds, extras, and numbers 78 and 55, 45, 29, and 39, and 44,—all kinds. I knew they run trains and I could look out for one most any time. . . I knew I could expect a train on that track most any old time. I also know they run extra freight-trains, and extra

freights and passengers. They run them every once in a while, run a number of trains. When I was on the lever-car I was expecting trains most any time." The plaintiff further testified: "On the 11th day of February, 1918, we put our car on the track and started to Cornelia to fix a railroad crossing. . . It was about 7 o'clock I suppose. It was hardly daylight. You could see pretty well. It made the headlight of the engine shine pretty bright. The headlight was shining. . . There were two tracks, north and south-bound main line. . . I knew I was on the north-bound line. . . We got about half way from Baldwin to Cornelia, and Dalton Lovell looked back and saw 36 coming, and said 'Boys, let's get off and get the car off.' . . I had my face towards Cornelia, and the engine was coming behind me. . . The minute he said 'Let's get off,' I knew the train was coming. . . When I first saw the train it was at least fifty yards from me. By reason of it not being quite daylight I don't suppose I could see him as far as he could see me. I don't suppose I could. . . I saw the headlight when it was at least fifty yards away. . . When I got on the ground and started to take the lever-car off, it was fifty yards away. . . I could have seen the headlight 200 yards, I guess, if we looked back. It came around the curve, and came out of the cut there. The cut at the end of the curve was 225 yards where he could have seen us. . . Cling Buchannon and the other men picked up and left. . . Cling left me. He had hold of my end. He joined the bird-gang, and I still stood and looked at the engine, but was struggling with the lever-car. . . Burton left, it might have been just a little before I did. . . It might have been just a minute. I say he might have left a little before I did, both of them [Burton and Lovell], but it was not over that. . . Lovell left before I did, just a little before I did. He had his back to the lever-car. I saw him leave, and then I left. I didn't leave quite quick enough. If I had, I wouldn't have got hit. . . Trains numbers 36, 37, 38, 40, 42, 29, and 30 always run fast, but didn't run much fast up grade; didn't run much faster than 36 was running the day I got hurt. . . If Dalton Lovell ever did warn me to get away from the car, that it was going to be struck, after he told me to move it off the track, I didn't hear him."

Dalton Lovell, sworn in behalf of the plaintiff, testified: "I

was section-foreman for the Southern Railway on the Baldwin section, and was on the lever-car that was struck by the train coming from Baldwin to Cornelia. When I first saw the headlight, the train was about 200 yards from the lever-car. When I first saw it I put on the brakes and said, 'Let's get off.' . . The engineer in charge of the train, if there had not been smoke, could have seen the lever-car about 200 yards. It was early in the morning and smoky. . . The first section of train 36 had already run, but the second section had not run. The second section has not got any schedule that I know of. The first section is the one that is on the time table. . . If the second section, which struck us, was late, I didn't know it. There was not any operator at Baldwin to tell how late it was. . . As to my warning Simmons to leave the lever-car before he did leave it, I didn't go around and tell him. I always taught them before, when we could not get a car off, to get away. . . My back was in the direction the train was coming. I had been looking back that way expecting the train any time. On these tracks they run the trains fast all the time. They run those passenger-trains sometimes behind time, and sometimes on time, but always along there fast. . . As soon as I hollered . . . Simmons knew it [the train]was coming. He got down off of the lever-car with his face towards the train, on the right-hand side of the track coming towards Cornelia. He was on the engineer's side. . . It was a dark and foggy morning, about daylight. I don't know whether it was hardly good daylight. It was winter time. The headlight was burning. It had to be burning on account of it being dark. Standing there where I was, I don't know how far I could have seen a man on the track ahead of me. I could have seen one fifty feet across there that time of day, a dark and smoky and foggy morning. . . Fifty feet is my estimate. . . Looking back in the direction the train was coming from, there is a cut and a curve. There was not anything to keep Simmons from seeing the train after he turned around. He said he did see the train. When I first put him to work I told him that he would have to look out for trains all the time, look for himself. . . On a clear day in good daylight the engineer could have seen the lever-car about 200 yards. . . On this particular morning the engineer could not have seen more than fifty feet, I guess, about fifty feet, because it

was cloudy and smoky, and not broad daylight. . . There was not any depot agent at Baldwin the morning we left there when Mr. Simmons got hurt, not at that hour. The Baldwin depot was supposed to open at 8 o'clock. . . Most of the time we left Baldwin before the depot was opened."

B. T. Holland, sworn in behalf of the defendant, testified:. "I am an engineer on the Southern Railroad. I was the engineer on the train that struck the lever-car when Mr. Simmons was hurt. I came around the curve that morning, I don't know. exactly what time,—about daylight. It was pretty foggy, and the first thing I knew I was right into the lever-car. As I came around through the cut I was looking out. It was about daylight, very foggy. The headlight was burning. When I first discovered the lever-car I put on the air-brakes as hard as it would go on in the emergency. When I first discovered the lever-car I don't think it was over 15 or 20 feet from me, maybe a little more. I discovered it as soon as I could. Just as soon as the conditions would let me, I saw it. I stopped as quick as I could, put the brakes on as hard as they would go on in emergency, and stopped. . . I had on my headlight. It was burning. It was an electric headlight, the kind in common use on the Southern Railroad. I was something near 25 or 30 feet of the lever-car when I first saw it. . . A man looking out on the tracks with a headlight of the kind generally in use on the Southern Railroad could not see a car and four men over 30 or 40 feet, there was such a fog. . . That headlight throws a light in front of an engine a considerable distance, owing to the condition of the weather. If there is nothing there to obscure the light, you can see a mile. . . In the condition of the fog that morning, you could not see over 40 or 50 feet. I was in 40 or 50 feet of this hand-car when I first saw it. . . The train was running 35 or 40 miles an hour."

The jury returned a verdict in favor of the plaintiff, the defendant's motion for a new trial was overruled, and the movant excepted.

*Edgar A. Neely,* for plaintiff in error.

*J. J. & Sam Kimzey,* contra.

JENKINS, J. (After stating the foregoing facts.)

Since this action was brought under the Federal "employer's liability act," the provisions of that act are controlling, and the case must be decided in accordance therewith. As was held in

*Charleston &c. Ry. Co.* v. *Sylvester,* 17 *Ga. App.* 85 (86 S. E. 275) : "In a suit brought under the Federal 'employer's liability act,' except as to violations of Federal statutes for the protection of employees, assumption of risk is an absolute defense, while contributory negligence merely reduces the damages. Roberts, Injuries to Interstate Employees, § 130; Seaboard Air-Line Ry. *v.* Horton, 233 U. S. 492 (34 Sup. Ct. 635, 58 L. ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475)." In such a case there is no presumption of negligence against the defendant, and it is well settled that, under the provisions of this act, the plaintiff not only assumed whatever risks were normally incident to his employment, but also those defects and risks which were known to him, or which were plainly observable, although due to the master's negligence. See *Charleston &c. Ry. Co.* v. *Sylvester,* supra, and cases cited. It will be borne in mind that in cases of this sort, no matter what acts of negligence on the part of the defendant may be shown by the evidence, the plaintiff must recover, if at all, upon proof of one or more of the specific acts of negligence alleged in the petition, and that there can be no recovery unless one or more of these acts is established by proof. See *Jarrell* v. *Seaboard Air-Line Ry.,* 23 *Ga. App.* 719 (99 S. E. 386 (1-b) ), and cases there cited. In the case of *Southern Railway Co.* v. *Blackwell,* 20 *Ga. App.* 630 (93 S. E. 321), which was a case very similar to the one now under review, this court held that "One of the risks assumed by the plaintiff in this case (who was employed as a track-hand), upon entering the service of the railway company, was the danger ordinarily incident to the usual and proper operation of its trains over the track upon which he was at work. This proposition is the fundamental principle underlying the decision of the Supreme Court in the case of *L. & N. Railroad Co.* v. *Kemp,* 140 *Ga.* 657 (79 S. E. 558)." In the *Kemp* case, the plaintiff was foreman in charge of a force of section-hands, and his duties required him to inspect and maintain the tracks and roadway of the defendant upon his section. While engaged in the inspection of the tracks he was confronted with an emergency occasioned by the sudden appearance of a freight-train, operated in the usual method, which rounded a curve, and in attempting to remove from the track the hand-car on which he was riding, and avoid the impending danger to himself and his hand-car, he was injured. The Supreme

Court expressly ruled in that case that under this state of facts the plaintiff could not recover. It was further held in the *Blackwell* case that "To justify a recovery for injury caused by a train striking a section-hand while engaged in repairing a track, it must be shown that the proximate cause of his injury was the railway company's neglect of some duty to him in respect to his protection from injury by passing trains," citing Norfolk &c. Ry. Co. *v.* Gesswine, 144 Fed. 56 (75 C. C. A. 214); Aerkfetz *v.* Humphries, 145 U. S. 418 (12 Sup. Ct. 835, 36 L. ed. 758).; Ellis *v.* Louisville &c. Ry. Co., 155 Ky. 745 (160 S. W. 512); Morris *v.* Boston & Maine Rd., 184 Mass. 368 (68 N. E. 680); and quoting from the case of Woods *v.* St. Louis &c. R. Co., (Mo), 187 S. W. 11, as follows: "It is not the duty of a railroad company to notify sectionmen that any certain trains are expected to pass over the road, but it is their duty to be on the lookout and keep out of the way."

In the case of Connelley *v.* Pennsylvania R. Co., 201 Fed. 54, 56 (119 C. C. A. 392, 47 L. R. A. (N. S.) 867), the Circuit Court of Appeals said: "It is an obvious fact that many occupations, as for example a powder mill operator, a structural iron worker, a diver, a blaster, a trackwalker, necessarily subject those who follow them to great danger. When, therefore, a man contracts for such employment, he knows and takes on himself the risks and dangers incident to such dangerous work. His assumption of those obvious and unavoidable risks is in the very nature of things part of his employment. It follows, therefore, that the employer violates no legal duty to the employee in failing to protect him from dangers which cannot be escaped by any one doing such work. . . It is obvious that even where a railroad operates its trains and moves its switch drafts in a proper and careful manner, trackwalkers and repairmen are necessarily subjected to great risks. Their very occupation is one of constant peril. Indeed, it follows from the nature of such employment that the duty of self-preservation has to rest on them, for no adequate protection, other than self-protection, can be afforded them. And such has been the reasonable holding of the law. . . Indeed, in thus making self-protection the substantial safeguard of trackwalkers and sectionmen, the law is reasonable and just, for no other dependable safeguard can be afforded their perilous work in the practical operation

of railroads." And in the case of Linz *v.* Chicago, B. & N. R. Co., 93 Wis. 16 (66 N. W. 718), the Supreme Court of Wisconsin held: "A section-hand whose duties required him to ride over the road on a hand-car, and who had been notified by the company, and of his knowledge knew, that wild trains were frequently run over the road at a high rate of speed, assumed the risk of injury from being run into by one of these trains running at a high rate of speed on a foggy morning."

Applying this principle of law to the facts adduced upon the trial of this case, we are compelled to set aside the verdict in favor of the plaintiff. As has already been stated, there is no presumption of negligence against the defendant in this case. It will be seen from the plaintiff's own testimony and that of the witnesses sworn in his behalf, as well as from the uncontradicted evidence in behalf of the defendant, the employees of the defendant in charge of its locomotive and cars which injured the plaintiff used all ordinary care and diligence to avoid the injury. The plaintiff, besides knowing that he might expect a train along this track at any time, was in point of fact specifically warned of, and saw the approach of, the train which caused his injuries, in ample time to have avoided the injury by the exercise of the slightest degree of care upon his part. There is no evidence to show that the engineer in charge of the defendant's train could, in the exercise of the degree of care required by law, have known of the presence of the plaintiff on the track. According to the testimony of the plaintiff himself, it was not good daylight at the time he was injured; and while he testified, "I don't think it was misty, I wouldn't say," the positive testimony of the foreman in charge of the section-crew, who was sworn in behalf of the plaintiff, and the engineer in charge of the train which caused the injury, sworn in behalf of the defendant, was to the effect that it was cloudy, misty, foggy, and smoky, and that the engineer couldn't have seen the car and the plaintiff a distance of more than fifty feet. The cloudy, misty, foggy, and smoky condition existing at the time the injury occurred prevented the engineer from seeing the plaintiff in time to avoid the accident. When the engine came out of the cut and around the curve onto the straight stretch, it was running at the usual rate of speed of about 35 or 40 miles per hour, but, due to its close proximity to the hand-car at the time its presence was

discovered, it was impossible to stop the train in time to prevent striking the hand-car, although the brakes were applied and the engineer did everything in his power, when the emergency arose, to avoid injuring the plaintiff. It follows, from what has been said, that the plaintiff was guilty of no negligence in the operation of its train.

It is insisted, however, that the defendant's foreman was negligent "in ordering plaintiff to remove the lever-car from the track, as the train was so close to it," and that the plaintiff was injured while in the line of his duty, under the orders and in the immediate presence of the "boss," to whose orders he was subject. While it is true that a servant is bound to obey a command, when given as such, by one occupying the relation of vice-principal to the master, if it pertains to the duties of the servant's employment and does not involve a violation of the law, and if the act required is not one which is of itself so obviously dangerous that no person of ordinary prudence could be expected to perform it, still even the direct and immediate order of the master will not justify a servant in rashly exposing himself to a known and obvious danger; and if, in compliance with the command in such cases, the servant be injured, he can not recover of the master therefor. *Whiters* v. *Mallory S. S. Co.*, 23 *Ga. App.* 47 (97 S. E. 453); *International Cotton Mills* v. *Webb*, 22 *Ga. App.* 309 (96 S. E. 16). Thus, granting for the sake of the argument, that the foreman was negligent in ordering the plaintiff to remove the lever-car at the time and place that he did, the order was negligent only by reason of the close proximity of the approaching train, and this fact was, according to the plaintiff's own testimony, known to and plainly observable by him. In the case of *Charleston &c. Ry. Co.* v. *Sylvester,* supra, this court held that under the Federal "employer's liability act," the employee not only assumes the ordinary risks and hazards of his occupation, *but also those defects and risks which are known to him, or which are plainly observable, although due to the master's negligence.* And in Gila Valley Ry. Co. *v.* Hall, 232 U. S. 94 (34 Sup. Ct. 229, 58 L. ed. 521), the United States Supreme Court held that an employee "is not to be treated as assuming the risk arising from a defect that is attributable to the employer's negligence, *until the employee becomes aware of such defect, or unless it is so plainly observable that he may be presumed*

*to have known of it.* [Italics ours.] In order to charge an employee with the assumption of risk attributable to. a defect due to the employer's negligence it must appear not only that he knew (or is presumed to have known) of the defect, but that he knew it endangered his safety; or else such danger must have been so obvious that an ordinarily prudent person under the circumstances would have appreciated it." See also Cincinnati, N. O. & T. P. Ry. Co. *v.* Thompson, 236 Fed. 1 (149 C. C. A. 211). Thus it is impossible to hold, under the facts as disclosed by the record in this case, that the plaintiff did not know and appreciate the obvious danger incident to remaining upon the track in the face of an oncoming locomotive, whose gleaming headlight was staring him in the face. We are compelled to say that he assumed the risk which occasioned his injury.

While constrained to hold as we do, we at the same time feel that the purpose and conduct of the plaintiff in continuing his desperate attempt to remove the hand-car from the track, in order to prevent a collision such as might imperil many passengers and others, was both fearless and highly commendable; but the law, unfortunately for the plaintiff, places upon him, and not upon the company, the risk incident to his courageous act.

*Judgment reversed. Wade, C. J., and Luke, J., concur.*