## TEXAS AND PACIFIC RY. CO. V. I. C. BRADFORD.

(Case No. 2038.)

1. MASTER AND SERVANT—The liability of a master to his servant for injuries result-ing from the use of a defective implement arises from the duty of the master to furnish proper tools to perform his work; and a servant, unless the defect of the tools be patent, may assume that the master in this respect has performed his duty. But when the servant knows that the master has not furnished proper implements for the performance of his work, and continues in the employment using such implements, he will ordinarily be held to have assumed the risk in-cident to their use.

2. CASE REVIEWED—Ford v. Railway Company, 110 Mass., 241, reviewed.

3. KNOWLEDGE—MASTER AND SERVANT—A servant who attempts the execution of work for his employer with tools furnished him, and which he knows are not proper for the work to be done, will be charged with a knowledge of those nat-ural laws which render the performance of his labor dangerous, when attempted with such improper tools. Under such circumstances the master is not liable when personal injury results, and the fact that a man of ordinary prudence might have continued in the master's service and attempted to perform the work with the same tools under like circumstances, will not vary the rule.

APPEAL from Red River.    Tried below before the Hon. D. H. Scott.

*R. C. Foster* and *A. E. Wilkinson*, for appellant, cited: Railway Company *v.* Lempe, 59 Tex. 19; Walsh *v.* Railway Company, 2 Am. and Eng. Railway cases, 144; Coolbroth *v.* Railway Company, 21 Id., 599; Kelley *v.* Railway Company, 5 Id., 469; Rasmusson *v.* Railway Company, 18 Id., 54; Simmons *v.* Railway Company, 18 Id., 50; Naylor *v.* Railway Company, 5 Id., 460; Railway Company *v.* Gildersleeve, 33 Mich., 134; Day *v.* Railway Company, 42 Mich., 523; 2 Am. and Eng. Railway Cases, 126; Muldonney *v.* Railway Company, 39 Ia., 615; 8 Am. Ry. Reps., 492; Railway Company *v.* Smithson, 1 Am. and Eng. Rail-way Cases, 103 to 105; Morse *v.* Railway Company, 11 Am. and Eng. Railway Cases, 168; Bryant *v.* Railway Company, 21 Id., 593; Priestly *v.* Fowler, 3 M. and W., 1; Sweeney *v.* Railway Company, 8 Am. and Eng., 151; Dynen *v.* Leach, 26 Jur., 221.

*E. S. Chambers*, for appellee, cited: Railway Company *v.* Sullivan, 5 Texas Law Review, p. 185; Railway Company *v.* McNamara, 59 Tex., 255; Wood on Master and Servant, secs. 329, 344 and 345; Railway Company *v.* McAtee, 61 Tex., 695; Gibson *v.* Railway Com-pany, 2 Am. Rep. 500; Wood on Master and Servant, secs. 418, 428. Pierce on Railways, 370; Brabbits *v.* Railway Company, 38 Wis., 289; Hough *v.* Railway Company, 100 U. S. 217.

STAYTON, ASSOCIATE JUSTICE.—The appellee was foreman in charge of a section of appellant's railway, and had been working in that capac-

ity for about six years before he was injured; was forty-six years old, had been railroading the most of his life, and, from his own statement, understood that business.

He thus states the manner and cause of the injury for which he seeks to recover damages: "On March 5, 1884, the road master passed over my section (66), going west on defendant's road and ordered me peremptorily to straighten the rail, and told me that if I did not have it straightened by the time he returned that evening, he would find a man who would straighten it. Under these circumstances I attempted to straighten the rail with such tools as I had. I laid a tie across the railroad track and then took a crow bar and placed it at one end of the crooked iron rail, and then ordered the section hands to raise the iron rail up high, intending to let it fall across the tie, placed as above stated, so as to let the weight of the rail straighten itself by the fall. When they got it up as high as they were going to get it, they were to say 'high up' and then I expected to look out for the drop. It slipped, or something, and when the rail fell it jumped forward and caught me," etc.

The same official had several times before directed him to straighten the rail, which was very much curved, and he had objected to doing so because he "did not have the proper tools to straighten the rail with, and did not believe he could straighten it. We only had shovels, spades and track tools, and had no curving hook, an instrument used in straightening railroad iron rails."

He further stated that he "had no idea of any danger in the work, and only objected to undertake it because he did not think he could do it with the tools he had;" that a curving hook was a proper instrument to use in straightening crooked rails; that he had never been furnished with one, and did not know that they were furnished by the road to section foremen; that he could have straightened the rail by heating it, but could not have done so by the time the road master returned that evening; that he had never seen a rail so crooked as the one he attempted to straighten, straightened by section men, and that they were always taken to the shops for that purpose.

He further stated that road master instructed him how to straighten the rail, and that he followed his instructions.

The rail which he attempted to straighten was 26 or 28 feet long. The road master corroborated the statement of the appellee as to the orders given to him, and as to the tools he had, and he also stated that a curving hook was a tool necessary to straighten rails with safety.

The road master further stated, that he "did not consider the tools he had were sufficient to straighten the rail, but they were the only tools he had to use; it was a work of pressing necessity and had to be

done as we were short of rails. I consider that there is danger in trying to straighten any rail without proper tools. * * * * * * I did not think there was danger to the life of plaintiff in obeying the order." The order to the appellee to straighten the rail came from the road master who seems to have had charge of a division of the road, and he was ordered to have this done by the general road master.

Several railroad men stated that the effort to straighten the rail in the manner attempted was imprudent and dangerous; but one witness stated that the method adopted was recognized as a proper one for such work.

It may be admitted, under the facts proved, that the appellant is liable, if an individual master who should direct such work to be done, under the circumstances, would be liable.

It is to be observed in this case that the injury did not result from the use of any tool, implement or appliance defective, if considered with reference to the use to which they were adapted, and for which they were ordinarily used. There is no complaint that the crow-bar, tie placed across the rails, or the rails which supported it were unsound, or in any respect defective when so considered; nor is it claimed that the fellow-servants, who were assisting in the work, were not competent and suitable men in every respect for the employment in which they were engaged.

If the failure to furnish implements with which the work could be safely done be such neglect of duty in the master as would render him liable for an injury resulting from the use of implements not adapted to the particular work, but good of their kind and suitable for the purposes for which they were ordinarily used, as for negligence of the master in furnishing implements defective, then the knowledge that such tools were not suitable for the work undertaken would defeat a recovery by the servant, as fully as could this knowledge of the defective condition of implements which, if proper in kind, would be suitable and sufficient for the safe accomplishment of the work to be done.

The liability of the master to the servant for injuries resulting from the use of defective implements arises from the fact that it is the duty of the master to furnish implements not defective, and a servant, unless the defect be patent, may assume that the master in this respect has performed his duty; but when he has knowledge that the master has not done so, if he continues in the employment in which such defective implements are used, he must, ordinarily, be held to assume the risks incident to the service as it is attempted to be carried on, and not to assume only the risks incident to such service when carried on

with implements not defective of their kind and suitable to the work undertaken.

There can be no doubt that the appellee knew that the implements he had were not suitable in kind for the work required; for he assigned as a reason for not doing it when formerly requested to do so that he did not believe it could be done at all with the implements he had. He then certainly knew that the instrumentalities which he had were imperfect and insufficient when considered in relation to the work to be done. Of this his knowledge was as full as was that of any officer or servant of the company, for whose negligence in furnishing defective implements the company would be liable.

No question arises as to whether the injured servant had means of information as to unsuitable implements used. His own declarations show that, as to this, he was fully informed. He did not believe the work could be accomplished at all with the implements at hand. Such a belief, founded on facts patent, existing in the mind of a man having experience in relation to the matter to which the belief relates, is equivalent to knowledge. It is not the duty of a servant to assume and exercise the duties of an inspector that he may detect imperfections in implements not open to common observation, but if he knows of such imperfections, then it is incumbent upon him not to expose himself to dangers resulting from them; and if, after such knowledge, he exposes himself to such dangers, it must be held that he assumes the risk of receiving injury from the known defect, although the master, as well as the servant, had knowledge that the defective implement was used in the business.

It is frequently said that a servant must establish three propositions to entitle him to recover from the master for an injury received in the master's business:

"1. That the appliance is defective.

"2. That the master had notice thereof, or knowledge, or *ought* to have had.

"3. That the servant did not *know* of the defect, and had not equal means of knowing with the master." Wood on Master and Servant, 414.

For the purposes of this case, it may be admitted that the appliances were defective, and that the master had knowledge of that fact; but it cannot be claimed that the servant did not know of it. It has sometimes been said, that to defeat the right of the servant to recover, he must not only know that the defects through which the injury resulted existed, but that he must also have known the danger. The case of Ford *v.* Railway Company, 110 Mass., 241, is frequently cited to sus-

tain this proposition; but an inspection of the case shows that no such ruling was made.    That was a case in which an engineer sought to recover for an injury caused by the explosion of the boiler of the locomotive which he was running, and it was shown to be in some respects defective.    The court said, in passing on the propriety of the action of the trial court in refusing instructions, "it is plain that the plaintiff's knowledge that the engine was not in good working order, and was, to some extent, defective, is not conclusive evidence of want of due care on his part; it was for the jury to consider on the question of the alleged contributory negligence of the plaintiff; and they were told that if the plaintiff ran the engine when it was not in good working order, knowing it, and knowing that its condition was a sign of the defect which caused the explosion by which he was injured, or when, as a competent engineer, he ought to have known it, he could not recover."

This was simply an assertion that a defect which may not in any respect have caused the explosion, from which the injury resulted, could not be considered conclusive evidence of contributory negligence; but in illustrating the impropriety of giving the charge asked, the court referred to the charge given, and very properly held that if the engine was out of working order in such respect as to indicate that there was a defect which might lead to an explosion, then the engineer operating it, and knowing of the defect, could not recover.

The opinion we understand only to declare that knowledge of a defect, which, in the ordinary course of events—under the operation of well known laws governing matter—may result in injury, will cast upon the person who, with knowledge of such defect, continues to use the defective implement or machine, the risks incident to the business done with the defective implement or machine; but there is nothing in the opinion to indicate that the engineer must have had knowledge of the danger of an explosion, otherwise than as he may have been affected with knowledge or notice by the defect itself, that such an event might occur.

In the case before us, as before said, the appellee had notice, and even knowledge, of the defects, if they can be so termed, of the implements which he was using, and he now alleges, and bases his case upon the fact, that the injury resulted from the use of the implements known to be defective before and at the time he attempted to use them.    He knew the nature of the work to be done, and cannot be deemed to have been ignorant of natural laws, which made its execution dangerous if attempted with improper implements.    He was not an inexperienced man.    On the contrary, seems to have been a man of large

experience, and from the nature of the employment in which he had been long engaged, must have fully appreciated the danger involved in handling heavy bodies with insufficient appliances. There was neither any hidden imperfection in the instrumentalities used nor danger to be foreseen, open to the observation of the agents of the appellant, but hidden to him. There was no sudden emergency calling for such speedy action as gave no time for full contemplation of the defects and the results that might ensue.

It has sometimes been held that, although the servant may have been aware of the defect, yet if a man of ordinary prudence, on this account would not have refused to do the work, but would have continued in the service and have attempted to perform it, that then he may recover for an injury resulting from such defect.

It seems to us that such a rule is unsound; for if the servant, acting as a prudent man would ordinarily act, would undertake to do the work with knowledge of the defect, this very test relieves the master from liability; for the obligations and duties of master and servant are correlative; each is held to that degree of care, in reference to all matters affecting the safety of the servant while in the master's employment, which men of ordinary prudence would or ought to exercise under the same circumstances. If the servant, with a knowledge of the defect, as a prudent man, may undertake the work, can it be said that the master has not exercised that degree of care required of him? It would seem, however, that the appellee had knowledge even of the danger; for, in detailing the manner in which the injury occurred, he stated that when the end of the rail reached the highest elevation to which it was intended to carry it, his assistants were to give the words which were to indicate that fact, "and then I expected to look out for the drop."

Why look out for the drop? Evidently for no other reason than that he knew there would be danger to himself in the fall of the rail—that he might be injured just as he was—and that on this account it was necessary for him to know just when the rail would fall that he might take such precautions as were necessary for his own safety. From his own statement of the matter, the inference is very strong, that the injury resulted from the fact that his fellow servants did not use due care or that the implements they had were not carefully used. What we have said indicates sufficiently our views of the law of this case, and it is unnecessary further to consider the several asssignments questioning the correctness of several parts of the charge given. The

charge seems to have been, in the main, carefully drawn, but parts of it were calculated to mislead the jury, if not erroneous.

We are of the opinion that the motion for a new trial should have been granted, and the judgment of the court below will be reversed, and the cause remanded.

REVERSED AND REMANDED.

[Opinion delivered November 19, 1886.]