INTERNATIONAL & GREAT NORTHERN RAILROAD COMPANY v.
B. F. STORY.

Decided April 2, 1901.

**1.—Master and Servant—Assumed Risk—Obvious Defects.**

The master is not liable for injuries to the servant arising from obvious defects in the instrumentalities of the business in which the servant is employed, the danger therefrom being an assumed risk on the part of the servant.

**2.—Same—Defective Car—Injury to Brakeman.**

Where an experienced brakeman sustained injuries by reason of defects in a disabled car which was, in due and usual course, being carried to the repair shop as part of his train, and the injury resulted from his failure to observe its dangerous condition, he could not, its defects being patent and obvious, recover for such injuries.

**3.—Same—Rule of Liability—Injury as Probable Result.**

There can be no liability for an injury unless the act, which causes the injury, was one from which, under all the circumstances, it might reasonably have been anticipated that the injury would have resulted as a probable consequence.

Appeal from Anderson. Tried below before Hon. A. B. Lipscomb.

*G. H. Gould* and *W. B. Teagarden,* for appellant

*B. H. Gardner, B. S. Gardner,* and *Campbell & McMeans,* for appellee.

PLEASANTS, ASSOCIATE JUSTICE.—Appellee brought this suit to recover of appellant damages for injuries to his person alleged to have been caused by the negligence of appellant. The trial of the cause in the court below resulted in a verdict and judgment in favor of appellee for the sum of $7000, from which judgment appellant prosecutes this appeal. The petition charges the defendant with negligence in allowing a defective and unsafe car to be placed in the train on which plaintiff was a brakeman, and in failing to notify plaintiff of the condition of said car, and further alleges that the conductor of the train negligently represented to plaintiff that said car was a flat car, when in fact it was a box car from which the sides had been burned, by which representation of said conductor plaintiff was misled as to its condition and went upon said car in the proper and necessary discharge of his duties as brakeman of said train without knowing its unsafe and dangerous condition and thereby received the injuries complained of.

Among other defenses, the defendant pleaded that plaintiff's injuries (if any had been sustained by him) resulted from no negligence on the part of the defendant, but from risks ordinarily incident to plaintiff's duties under his employment and which were well known to the plaintiff, or could have been known to him by the exercise of ordinary care on his part; that the defective condition of said car was patent and obvious; that it had long been the custom of defendant to have its defective cars taken to its repair shops at Palestine, Texas, for the purpose of having

same repaired, and that the car in question was being carried to Palestine for said purpose, and was so transported in accordance with the usual and ordinary method and custom of defendant, which custom existed at the time and long before plaintiff took employment with the defendant, and has existed ever since, and was well known to plaintiff both at the time he entered defendant's service and ever since, and he had frequently before the alleged accident engaged in hauling defective cars to defendant's shops, and such service was in the line of his duties under his employment, and he voluntarily assumed the risk of such service, well knowing its danger. The following is a succinct statement of the facts deduced from the record:

Plaintiff was an experienced railroad brakeman; had been working for different roads as switchman, brakeman, conductor, or yardmaster for twelve years, and was employed as brakeman on defendant's road from July, 1899, up to the time of the accident, which occurred November 25, 1899. At the time of the accident he was swing brakeman on the local freight train of defendant which ran between Palestine and Willis. On the day of the accident this train left Willis at 7:30 a. m., and arrived in Palestine at 8:30 p. m. The train crew consisted of the engineer, fireman, front and rear brakeman, middle or swing brakeman and conductor. The swing brakeman carries the switch list, and the train is made up and the switching done under his direction. Just before the train left Willis that morning, the conductor handed plaintiff the switch list, and ordered him to make the train up. The other two brakemen, under plaintiff's direction, made up the train and put all of the cars in their proper position in the train. The number of cars in the train varied at different times during the day, owing to the fact that cars were put in and set out at the different stations along the line, but the average number during the entire day was from twenty-five to thirty. Among the cars in this train were two disabled or "bad order" cars. which were placed next to the caboose when the train was made up at Willis. The car next to the caboose was a box car from which the sides had been burned, and in the floor of which numerous holes had been burned ranging in size from a few inches to several feet in diameter. Plaintiff claims that he did not see or know the condition of this car until the train was going into Palestine that night, when he started back from his position on the train near the middle to go to the caboose for the purpose of washing his hands and face preparatory to leaving the train and going home as soon as the train reached the station. In order to reach the caboose he had to walk over this burnt car. When he reached a point near the middle of the car he discovered a hole in front of him, and stepping to one side to avoid falling in the hole, his foot broke through the burnt floor of the car, and he was thrown off the car on the ground and thereby received the injuries complained off. Plaintiff testified that he was not nearer than eight or ten car lengths from this car when he made the train up at Willis, and that he thought it was a flat car, and that when the conductor told him to make up the train

he asked him, "How about that box car which is ahead of the flat cars?" to which the conductor replied that it was a bad order car, and should go in the train just at it then stood on the track. A rule of the company required all flat cars and bad order cars to be hauled in the rear of the train next the caboose, but plaintiff testified that this rule only applied to bad order cars when their drawheads were out of order and they had to be fastened in the train with chains; and that when in this condition, they were put next to the caboose where they were less apt to be pulled aloose by the weight of the train, but if the drawheads were all right, bad order cars might be put in any part of the train. When a bad order car is to be taken to the shops, the car inspector generally marks them and puts a tag on them, and if they are not safe, they put them in safe condition to be handled by the trainmen. This car had no marks or tags on it. Plaintiff further testified that the swing brakeman on a local train is a kind of foreman. He has charge of the other two brakeman, and attends to making up the trains and the switching, and keeps a record. It was plaintiff's duty to check up the cars in the train, and in order to do this he would have to go near each car and get its number and marks of identification. He says he did not check up these bad order cars at Willis that morning because they were pointed out to him by the conductor and he was told to put them in the train just as they stood, which would place them next to the caboose, and that the conductor checked the cars after the train was made up. Cars were put in and put out of the train at five or six stations along the route during the day, and plaintiff had charge of and directed all of the switching, but he testifies that he was not close enough to the car in question at any time during the day to observe its defective condition. He knew that it was the custom of the defendant to haul its defective cars to Palestine for repairs on the local train on which he was brakeman, and had handled defective cars on said train shortly before the day on which he was injured, but he testified that none of said cars were defective in the manner and to the extent as the one by which he was injured, and claims in his testimony that the defendant could have made said car safe to handle by placing a running board across it for the brakemen to walk on, and that he had seen defective cars repaired in this way before they were put in a train. The evidence shows that the bad order or defective cars on defendant's line south of Palestine were all hauled to Palestine by the local freight on which plaintiff was brakeman, and that during the sixty days preceding plaintiff's injury not less than forty disabled cars were hauled by said train. The train made the trip in the day time, and for this reason hauled all disabled cars, as they could be more safely handled in the day than at night. It was not defendant's custom to make any repairs on disabled cars which were being carried to the shops except such as were necessary to make them safe to be hauled in the train. If the drawheads or running gear were out of fix, such defects were remdied sufficiently to make them safe to haul. If the running board on a

car in service became unsafe, a new board would be placed on it so as to enable the brakemen to pass over it safely, but no such repairs were made on cars not in service and which were being carried to the shops for repair. The testimony as to the condition and appearance of the car in question is undisputed.

Hughes, the conductor, testified: "The condition of the car was very bad. It was burned, and the floor of the car charred very badly, and there were little pieces of siding sticking up two or three inches high the whole length of the car. The rods were bent over across the car. The condition of the car could be seen at a glance. A person could see it a good reasonable distance on account of the irons and things on it. You could see where it was burned off the sides probably fifty yards."

Talbert, a brakeman on defendant's road who had handled the car the day before the accident, testified: "There was iron sticking up and lying across over the car. The irons that hold the roof to the sides, iron rods, some were standing up alongside the car and some were lying over the car. I don't know how many there were of those irons. I never noticed the ends very closely. I know it was burned, but did not notice how much, but the sides of the car were sticking up in some places six inches above the sills, perhaps ten inches in places. The floor of the car was in a bad condition all over; burned all over and kind of charred all over, and there were a few holes in the car floor. I don't know how many. The car at a distance did not have the appearance of being a flat car. I could tell four or five lengths off that it was not a flat car. Anyone could see it was a burnt car. The car was safe to haul in a train in the place it was hauled; it was strong enough to hold the weight of the caboose and two or three other cars."

Frost, the rear brakeman on the train with plaintiff, testified as to the condition of the car as follows: "It looked to be a box car with the sides, roof, and ends burned off, charred, and holes burned in it. When I first noticed it (this car) was when Talbert spoke to me about it. This was the first time I noticed it was burnt and in bad order. When I first looked at it I reckon I was forty or fifty feet from it."

Lovett, defendant's car inspector, testified that he saw the car at Palestine on the morning after the accident and examined it. He found the roof and sides of the car burnt off, and the floor pretty well scorched, and some of it scorched and burnt off. There were three large holes in it, running from sixteen and eighteen to thirty-eight inches, and some running as large as six or eight inches in diameter. The whole floor was scorched. There were two or three rods standing up three or four feet, but the rest were all bent and lying on the car. Does not remember how many rods. Some cars have more than others, and this car may have had as many as sixteen or may have had less.

Plaintiff testifies on this point as follows: "The car showed that it had been burned. I think a man walking by the car would have seen its condition. If I had walked by the car that day, I think I would

have seen its condition.    By walking by it I could have seen the holes
in the floor.    A man would not have had to give the car any special
attention to have seen its condition.    It would have been easy for the
holes to have been seen by any person walking by the car.    You could
see that the sides of the car had been knocked off.    It was perfectly
plain to·be seen walking by.    I could have seen that it was burnt."
When plaintiff went on this car at the time he was injured he says he
had his lantern which, while a little smoky, was giving as much light
as usual for railroad lanterns to give.    He walked across the car where
there were as many as eight three-fourth inch rods seven feet long bent
across the car.    He says if he had been looking for the rods he would
have seen them, and that he can't explain how it was that he did not
see them.

We think the evidence in this case fully sustains appellant's plea that
the defective condition of the car was patent and obvious, and there is
no evidence in the record to support a contrary finding.    The master is
not, as a general rule, held liable for injuries to the servant arising
from obvious defects in the instrumentalities of the business in which
the servant is employed.    The danger from such obvious defects is an
assumed risk on the part of the servant, and the law implies as a part
of every contract of employment that the servant shall be presumed to
know that which is plain to be seen.    The general rule is well estab-
lished that a servant can not recover for injuries which result from his
failure to look for defects or dangers in the place of work, or appliances
which are obvious, or which he ought to have foreseen.    Rogers v. Rail-
way, 76 Texas, 502; Railway v. Lempe, 59 Texas, 19; Railway v.
French, 86 Texas, 81.

We find no fact in evidence in this case which would render the gen-
eral rule as to the assumption by the servant of risks arising from ob-
vious defects in the instrumentalities of the business inapplicable or
unjust to the appellee.    The operation of railway trains is necessarily
a dangerous employment, and the person who engages in such employ-
ment assumes the risks ordinarily incident thereto.    The hauling of de-
fective cars to the shops for repair was absolutely necessary in proper
conduct of appellant's business.    While it is true, as said by Judge
Stayton in the case of Railway v. O'Hare, 64 Texas, 600, that the rule
which requires the master to exercise proper care to furnish the employe
reasonably safe and proper appliances with which to perform his serv-
ice, applies as well to the removal of disabled cars as to the operation of
trains on the road, such rule in no way impairs the force of the general
rule that the master will not be held liable for injuries caused by de-
fective appliance, when the defects·in the appliances are patent and ob-
vious, in which case the servant may not close his eyes to such defects
and assume that the appliances are safe.    Railway v. Bradford, 66
Texas, 732.    It has been said that the rule which designates risks
which arise from obvious defects as one of the assumed risks of the
servant is founded upon public policy in that it requires the employe to

exercise proper diligence and caution to protect himself and his fellow-servants, and that an opposite rule would subject employers to unreasonable and often ruinous responsibilities and embarrass all branches of business, and would not afford as great security against injury to the servant.

We think the rule can be well founded upon another principle. It is a doctrine firmly established by the decisions of our courts that there can be no liability for an injury unless the act which causes the injury was one from which, under all the circumstances of the particular case, it might reasonably have been anticipated that the injury would have resulted as a probable consequence. It can not be said that the master could reasonably anticipate that the servant would not use the necessary care to protect himself from the danger arising from the use of appliances which are obviously defective. Applying this rule to the facts in this case, we find no act or omission on the part of appellant from which the injury to appellee might have been reasonably anticipated as a probably result.

Appellant, in hauling the car in question in the manner and under the circumstances under which it was hauled, was following its usual custom. Appellee was an experienced railroad man, and knew that it was customary for the train upon which he ran to haul disabled cars on appellant's line south of Palestine to that place for repairs. The condition of the car was so apparent and obvious as to relieve the appellant of giving notice of same, and appellee does not claim in his testimony that he should have been told of the condition of the car. Granting for the sake of argument that the conductor, when he instructed appellee to make up the train at Willis, did lead appellee to believe that the car in question was a flat car, and not in a defective condition, and that such act on the part of the conductor was negligence, it can not be said that the injury to appellee, as the probable result of such negligence, could have been foreseen. The conductor could not have reasonably anticipated that appellee,—whose duty ordinarily called him to every part of the train and required him to check up every car in the train, see to the placing of cars in their proper position in the train and direct all of the switching,—would, during that entire day, not go near enough to the defective car to observe its condition. It is true the appellee testified that it was customary to mark all bad order or defective cars, and to put a tag on them, and that this car had no mark or tag placed on it, but the failure to so mark and tag the car can not be held to be negligence in the face of the undisputed evidence that the appearance of the car proclaimed its defective and dangerous condition much more loudly than any mark or tag could have done.

We think appellant's assignment which attacks the verdict because it is not supported by the evidence and is contrary to law should be sustained. The judgment of the court below will be reversed and the cause remanded, and it is so ordered.

*Reversed and remanded.*