## CLEMENT v. GULF, C. & S. F. RY. CO.
### (No. 271–3499.)

(Commission of Appeals of Texas, Section B. Jan. 25, 1922.)

**1. Negligence ⊕⟿59—Test of proximate cause.**

Before negligence can be the proximate cause of an injury, the injury must be the natural and probable consequence of such negligence and of that character which should reasonably have been foreseen as such a consequence in the light of attending circumstances.

**2. Master and servant ⊕⟿204(1) — Assumed risk defense under federal act.**

Action for personal injuries received while repairing a leak in a tank car containing an interstate shipment of gasoline was governed by the federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665), and, in the absence of an allegation that defendant's negligence involved the violation of a federal statute, the defense of assumed risk, as a complete bar to the action, was available to the defendant.

**3. Master and servant ⊕⟿217(20)—Risk of repairing gasoline tank car assumed by servant discovering dangerous condition.**

One employed by a railroad to repair leak in car said to contain an interstate shipment of "unrefined naphtha" assumed the risk of repairing a leak in a car containing casing-head gasoline, where he discovered after going upon the car that it contained such gasoline and voluntarily continued his efforts to repair the leak, and the railroad was not liable under the federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665).

**4. Master and servant ⊕⟿288(5)—Knowledge by workman of danger of repairing gasoline tank car held for jury.**

In an action under the federal Employers' Liability Act by one employed to repair leak in tank car containing interstate shipment of casing-head gasoline, whether plaintiff discovered the nature of the contents of the tank before explosion thereof and continued voluntarily to remedy the leak, and thereby assumed the risk, *held* for the jury.

**5. Master and servant ⊕⟿217(26)—Risk of repairing gasoline tank car assumed by expert workman disregarding directions on dome.**

An expert employed by railroad to repair leak in tank car containing interstate shipment of casing-head gasoline assumed the risk of an explosion when he disregarded instructions on the dome and loosened the dome cap and caused the explosion, and could not recover under the federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665), though the yardmaster who employed him was assisting him.

Error to Court of Civil Appeals of Second Supreme Judicial District.

Action by W. J. Clement against the Gulf Colorado & Santa Fé Railway Company. From a judgment of the Court of Civil Appeals (220 S. W. 407) reversing a judgment in his favor, plaintiff brings error. Affirmed.

Stuart, Bell & Moore, of Gainesville, for plaintiff in error.

Terry, Cavin & Mills, of Galveston, Garnett & Garnett, of Gainesville, and Lee, Lomax & Wren, of Fort Worth, for defendant in error.

POWELL, J. In stating the case, we feel we can do no better than quote as follows from the opinion of the Court of Civil Appeals:

"There was an explosion of gasoline in a tank car in the yards of the Gulf, Colorado & Santa Fé Railroad Company in the town of Gainesville. W. J. Clement was seriously burned as a result of that explosion, and the railway company has prosecuted this appeal from a judgment rendered in his favor for damages for the injuries so sustained.

"R. G. Porter was the defendant's yardmaster at Gainesville, and, upon discovering that gas was spewing from the car, called upon W. J. Clement to remedy that leaky condition. Clement was then working for the Producers' Refinery Company in Gainesville, and frequently had been called upon by Porter to look after leaky oil cars coming into defendant's yards in as much as he had the necessary tools and equipment for that work, with which he was familiar. Clement had formerly been employed by the railway company in its train service as a switchman and brakeman, but was not so engaged at the time of the accident. The railway company always paid him for his services in relieving the leaky condition of cars.

"When Porter applied to Clement to stop the leak in the car on the occasion of the accident, he told Clement that the contents of the car was 'unrefined naphtha,' and that was the designation of its contents in the waybill which came with the car and was the source of the information given by Porter to Clement. The car contained casing-head gasoline or casing-head gasoline blend instead of unrefined naphtha, and was an interstate shipment originating in Drumright, Okl., and moving to Port Arthur, Tex. The place of the origin of the shipment was not on the defendant's line, but upon the line of a connecting carrier; the waybill designating the contents of the car as unrefined naphtha being furnished to the defendant by the connecting carrier. In the top of the car there was a manhole which was closed by what is called a dome cap screwed into the opening of the hole. Near this dome cap there was also a three-quarter inch plug, and the leak mentioned was around this plug and the dome cap. Porter went with Clement to the car, and, after examining it and discovering the source of the leak, they took the plug out and replaced it with another. Gus Vineyard, one of Clement's employees in his work for the Producers' Refinery Company, went with him as an assistant to remedy the leaky condition of the car.

"The gas pressure from within the car was so strong that it seriously interfered with the work of replacing the old plug with the new.

---

⊕⟿For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

After the new plug was put in, and after plaintiff and Porter had loosened the dome cap, the dome cap was blown out by the gas pressure in the car and the escaping gas and gasoline mixed therewith, which was thrown high in the air, caught fire, and before they could escape Porter and Clement were both severely burned; the injuries to Porter proving fatal."

The trial was before a jury, whose verdict was upon special issues submitted by the court. Thirty-six questions were propounded to the jury, but there were not that many controlling issues in the case. Necessarily many of the questions submitted to the jury related to the evidence bearing upon the issues and were not the issues themselves.

Upon the answers of the jury to the special issues, judgment was rendered by the trial court in favor of Clement for the sum of $7,500. The jury had assessed his damages at $10,000, but had deducted 25 per cent. thereof on account of his contributory negligence.

The railway company appealed from said judgment to the Court of Civil Appeals at Fort Worth, where the judgment of the district court was reversed, and judgment there rendered in favor of the railway company. See (Civ. App.) 220 S. W. 407.

Clement then sued out a writ of error to the Supreme Court. It was granted, and the cause is now before us for review and recommendation.

We do not deem it necessary to set out all of the special issues submitted to the jury, but will content ourselves with quoting a few of them which have application to what we deem the vital points upon which the decision must turn. Such special issues, and the jury's answers thereto, are as follows:

"Did the yardmaster, R. G. Porter, request plaintiff to inspect the car which afterwards exploded, and did he request that he, the plaintiff, offer such suggestions as to what, if anything, should be done with it? Answer: Yes."

"If you answer the foregoing question in the negative, then you need not answer this question, but, if in the affirmative, then was it negligence on the part of the defendant, acting through its yardmaster, to so request the plaintiff to inspect said car under the conditions as they existed at the time such request was made? Answer: Yes."

"If your answer to question No. 2 is in the negative you need not answer this, but, if you answer 'Yes,' then was such negligence the proximate cause or one of the proximate causes of the plaintiff's injuries? Answer: Yes."

"Did the plaintiff go and inspect the car upon the request of the yardmaster upon the representation of said yardmaster that the car contained unrefined naphtha? Answer: Yes."

"What did the car contain immediately prior to the explosion? Answer: Casing-head gasoline, or a casing-head gasoline blend."

"Did the plaintiff learn prior to the time the car exploded of what its real contents was? Answer: Yes."

"Did the car contain a placard upon its dome, or dome cap, containing a caution against the removal of the dome cap while there was gas pressure inside the car? Answer: Yes."

"If your answer to question 17 is 'No,' you need not answer this question, but, if your answer is 'Yes,' then did the plaintiff see such placard, or could he by the exercise of ordinary care have seen such placard? Answer: Yes."

"Did the plaintiff at any time while he was upon said car, either acting by himself or in conjunction with another, loosen the dome cap? Answer: Yes."

"If your answer to the question No. 19 is 'No,' you need not answer this question, but if your answer is 'Yes,' then did the loosening of such dome cap cause or contribute to the subsequent explosion? Answer: Yes."

"If your answer to question No. 20 is 'No,' you need not answer this question, but, if your answer is 'Yes,' then was such loosening. or unscrewing of the dome cap the proximate cause or one of the proximate causes of plaintiff's injury? Answer: Yes."

"If you have answered that plaintiff either by himself or acting with another did not loosen the dome cap, you need not answer this, but, if you have answered that he did, then would the explosion have occurred but for that act? Answer: No."

"Before said Clement went to said tank car on said morning of May 18, 1917, had he had any experience in handling the contents of tank cars when such contents were gasoline? Answer: Yes."

"If you answer yes, then state for how long a time he had had such experience? Answer: Five or six years."

"From W. J. Clement's experience and knowledge obtained by him while in the service of the G., C. & S. F. Ry. Co. as switchman and brakeman, did he at the time of going to said car know that it was custom and practice of the defendant to keep its switch lights burning in its yards at Gainesville, day and night? Answer: Yes."

"After going upon said tank car and prior to the explosion did plaintiff from his experience in handling gasoline or otherwise know or believe that the contents of said car was casing-head gasoline? Answer: Yes."

"If you answer issue No. 29 'Yes,' then state whether or not said Clement remained upon said tank car after knowing or believing that the contents were casing-head gasoline? Answer: Yes; just a short time. They were starting to get down when the explosion came."

"Would a reasonably prudent and careful man, in the exercise of ordinary care for his own safety, and possessing the knowledge and experience you may find plaintiff possessed at the time, have remained and worked on said car under the circumstances and conditions, which you may find from the evidence existed at the time? Answer: No."

"In requesting said Clement to come to said car, state whether R. G. Porter requested his presence as an expert in dealing with gasoline and other inflammable liquids? Answer: Yes."

"At the time the plaintiff went upon the car was he in the employment of the defendant? Answer: Yes."

"If your answer to question 33 is 'No,' you

need not answer this question, but if your answer is 'Yes,' did the plaintiff have knowledge of the risks and danger incident to employment in which he was at the time engaged? Answer: No; not at the time he went on the car."

"Does the evidence in this case show that the plaintiff was guilty of contributory negligence which was the proximate cause or one of the proximate causes of such injuries as he sustained? Answer: Yes."

The first question discussed by the Court of Civil Appeals is whether or not the relation of master and servant existed between the railway company and Clement at the time of the accident. The company contended, in spite of the jury's finding to the contrary, that Clement was an independent contractor; that, under the undisputed facts of this case, he was such as a matter of law. The Court of Civil Appeals overruled the contention of the company and held Clement to be an employé. We think this a very close question, under the facts of this case, but, in the view we take of the case, we agree, for the purposes of this case, that the Court of Civil Appeals correctly decided this point. Upon the theory that Clement was an employé we shall proceed to a determination of the other issues.

The Court of Civil Appeals finds that the evidence fails to show any negligence of the railway company which could have proximately caused the injuries complained of. That court very properly says that the only negligence complained of which could have caused the injury was the failure of the company to ascertain that the waybill covering the shipment did not speak the truth; that it said the car contained "unrefined naphtha," when it in fact contained casinghead gasoline, or casing-head gasoline blend. Clement testified that he would not have undertaken the work at all if he had known of the car's real contents. The evidence shows if he had remained at his usual place of business he would not have been injured. So the sole act of negligence on the company's part which could have any bearing upon the decision of this case is whether or not the company should have sooner discovered that the car had been erroneously waybilled. This car was packed in accordance with the rules promulgated by the Interstate Commerce Commission of the United States, and, when so packed and tendered, the carrier must accept it. The only evidence which tends to show that the company might have suspected an erroneous billing of the car was from the testimony of a brakeman, who says he noticed gas escaping from this car at Shawnee, Okl., where the defendant company took the car from its connecting carrier. As to whether or not this circumstance should have caused the company to doubt the correctness of the billing seems to depend largely upon the evidence of one In-

nes, explosive expert of the Interstate Commerce Commission. No one else really undertook to testify on the trial as an expert. Innes said the circumstances were not sufficient to have caused any change in the handling of the car, and that it would have been the duty of the company to continue to handle it as it did.

Consequently there is much reason for the holding of the Court of Civil Appeals that there was no actionable negligence shown, and therefore recovery by plaintiff was precluded.

[1] In addition to above, it seems to us that there is considerable doubt as to whether or not, even if the company had negligently failed to sooner ascertain the real contents of the car, such negligence could have been the proximate cause of the injuries. Even if the company had, upon investigation, ascertained that the car may probably have been erroneously waybilled, it was still true that upon the dome cap of that car was a caution in blazing letters warning parties about to work therewith not to remove the same when gas pressure existed. It might very well be argued, in our judgment, that the company would be justified in assuming that no expert would thereafter wade through such directions and bring about an explosion. Not only so, but that, after violating such instructions, such expert would loiter around after realizing imminent and serious danger, and receive injuries when he could have gotten away in safety. Before negligence can be the proximate cause of an injury, the injury must be the natural and probable consequence of such negligence. The injury must be of that character which should reasonably have been foreseen as such a consequence in the light of the attending circumstances. In addition to the cases upon this point cited by the Court of Civil Appeals, there is a very recent opinion of our Supreme Court by Chief Justice Phillips, which we consider very much in point with the case at bar, and especially upon the law point discussed. We refer to the case of Railway Co. v. Bennett. 110 Tex. 262, 219 S. W. 197. In that case the company asked an employé to assist in extinguishing a fire which was the result of negligence on the company's part. However, in sending this employé into the fight, the company told him to come out whenever he became too warm. He ignored these instructions and remained too long. He was denied a recovery of damages by our Supreme Court. In the case at bar Clement ignored the instructions on the dome cap, and as a result of his defiance thereof the explosion occurred very shortly thereafter. We are rather strongly impressed with the theory that, if any negligence of the company could be held responsible for the injury to Clement, it was too remote. Another interesting case

in this same connection is that of Railway Co. v. Behne, 231 S. W. 354, written by this section of the Commission of Appeals.

But, be that as it may, and conceding that the company was guilty of actionable negligence in not ascertaining before employing Clement that the car contained casing-head gasoline blend and so advising him, we are in accord with the Court of Civil Appeals when it says:

"The findings of the jury, considered in the light of the evidence, conclusively establish the defense of assumed risk pleaded by the defendant, even though the several findings of negligence of the defendant should each be held to be an independent issue and sufficient of itself to support a recovery."

[2] This case involved the handling of an interstate shipment, and this suit is governed by the federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665). There is no allegation that the defendant's negligence involved the violation of a federal statute; therefore the defense of assumed risk, as a complete bar to the action, was available to the defendant. This is well settled in a very able opinion of the United States Supreme Court, speaking through Justice Pitney, in the case of Railway Co. v. Horton, 233 U. S. 492, 34 Sup. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475. In that opinion Justice Pitney also writes most interestingly of the general law of assumed risk.

In the case of Southern Pacific Co. v. De la Cruz, 228 S. W. 108, the Commission of Appeals, with the approval of the Supreme Court, followed the case of Railway Co. v. Horton, supra, and others of a similar nature, and declared that in Texas the defense of assumed risk as a complete bar to recovery is available to a defendant when controlled by the federal Employers' Liability Act, as is the case at bar.

[3] Counsel for Clement seem to admit that, if he had been employed as an expert to remedy a dangerous condition and started for his work with that knowledge, he unquestionably would have assumed the risk. We agree with this proposition, but we think he would just as conclusively have assumed the risk if, after going upon the car, he learned that he was facing a dangerous condition and then voluntarily continued his efforts to remedy that situation. The material inquiry, as we understand it, is not how long before an accident an employé had known of the dangerous situation, but whether or not, after discovering it, he exercised his option and continued to work at such dangerous occupation. The authorities we shall hereafter cité under another phase of assumed risk sustain our view.

In the first place, we think the defense of assumed risk was established by Clement's own testimony on the witness stand at the trial.

The jury had the benefit of three different statements by Clement as to how the accident happened and his entire connection therewith.

About five or six days after the explosion the state fire marshal of Texas sent a deputy to the scene of the accident to make an investigation and report the situation to him. This deputy and his stenographer took a statement from Clement, in which, among other things, he stated:

"Well, Mr. Porter phoned me he had a leaking car, and told me to come on down and fix it. I went on down, and when I got there I saw we could not fix it, and I told him it was casing-head gasoline and liable to blow up. He said it is billed out as unrefined naphtha. I told him there was no such stuff. We looked at the manhead and I showed him the precaution. I told him we never took no such precaution on our cars, and they were casing-head gasoline."

Clement on the trial did not deny having made the above statement to the deputy fire marshal of the state, but said he was still suffering from his burns at the time it was made, and should not be held accountable for what he had said.

About five or six days after above statement was made, Clement signed a statement for the claim agent of the railway company which was substantially in accord with the former one to the deputy fire marshal. Clement had signed each page of the statement made to the claim agent, but he denied having read it over, and said he did not make the material portions of it. His third statement was upon the witness stand, and we quote the following from it:

"As to whether I testified when the state officials were up here examining into this fire, and I testified before Mr. Greenwood, and Mrs. Simpson took down my testimony, will say some man and woman come over to my house and took a statement. I do not know what it was. They did not swear me. The caution I had reference to in that testimony was with reference to those gaskets, and I never said anything about casing-head gasoline. As to what I meant by telling Mr. Porter the company never did take any such precaution on our cars, will say it was after I had taken the little cap outside and I noticed that pressure. I did not tell him it was casing-head gasoline. I did not know it was, for I never seen any. It was something more dangerous than gasoline or unrefined naphtha. I thought that because of that gasket over there the washer where the dome cap was screwed down. I told him that I was of the opinion that by reason of that precaution being taken it was something more dangerous than gasoline or unrefined naphtha. As to whether I went on and told him that we had some engines up in the yard and I told him he had better move away, that it might explode, will say I might have suggested that about a road engine. There was an engine at the roundhouse that I was telling

Mr. Greenwood about. I told him there was one setting down at the south end of the yard. As to whether I told him to move that tank car away that I was working on, will say I do not know the words exactly. I told him the best thing he could do was to take this tank car away, to get it clear away. I told him to do that because I regarded it as dangerous and it might explode. I did regard it as dangerous and thought there was danger of its exploding. I have been telling you all the time that we moved that plug and tried to put in a new one, and that we turned the dome cap about half way, maybe not so far, around, maybe a fourth. We took a 36-inch Stillson wrench to do it, both of us pulling on it. I answered that I do not think there was very much of an increase of vapor after we turned it.".

[4] It was the province of the jury, of course, to believe Clement's last statement and discredit the other two. For that reason, it may be conceded that when he first went upon the car he did not realize the dangerous situation. At least we so conclude, in deference to the jury's finding that he did not realize the danger when he went on the car. At the same time the jury later, in answer to issue No. 29, found that after going upon the tank car, and before the explosion, Clement knew of the real contents of the car. In no instance did the jury find that Clement did not realize his dangerous situation shortly after he went upon the car. From his own testimony, Clement continued his work after he realized the serious attendant dangers. He was at perfect liberty to desist at any moment. He went ahead at his own risk. Not only does his own testimony show that soon after he boarded the car he realized it contained something more dangerous than ordinary crude oil, but other witnesses introduced by him showed the situation to be most threatening. The day inspector for the company testified for Clement that he left there about 5 minutes before the explosion and told Clement at the time that he was leaving because the car was dangerous. Again, another car inspector passed along by the car 40 or 45 minutes before the explosion. Clement asked him to get up on the car and tighten a screw. The inspector declined to do so, but left the scene saying: "Boys, you ain't talkin' to me, and I am getting away."

The jury found that Clement had been employed as an expert in gasoline and other inflammable substances. It further found that he knew the switch lights were permitted to burn day and night. The gas was spewing out, and he knew the lights were burning. He realized the danger and ordered one of the engines kept in the roundhouse. He then saw Porter send another engine to another end of the yards. He saw an asbestos lining or gasket in the dome cap. He said he knew that was an unusual precaution, and not ordinarily taken with crude oil. These undisputed facts, in connection with his own testimony on the trial, showed, we think, that, after realizing the dangerous situation, he voluntarily continued his services as an expert. That being true, we are of the opinion that he must be held to have assumed the risk and not entitled to recover damages herein.

In addition to what has been said before, we think the findings of the jury we shall hereafter mention conclusively establish an assumption of risk by Clement and render recovery by him impossible. We refer to the following findings:

On top of the dome cap was a large warning card. In huge letters it read as follows:

"Caution. Avoid accidents. Do not remove the dome cover while gas pressure exists in tank. Keep lighted lanterns away."

That Clement had had five or six years' experience in handling gasoline tank cars. That Porter employed him as an expert in volatile substances to examine a leaky car and make suggestions. That plaintiff saw the caution card, or should have seen it. That he was charged with knowledge of it. That while on said car Clement, acting alone or in conjunction with another, loosened the dome cap. That such loosening of the cap caused or contributed to the subsequent explosion. That such loosening of the dome cap was the proximate cause, or one of the proximate causes, of plaintiff's injury. That but for the act of unloosening the dome cap the explosion would not have occurred.

The jury found that the car in question contained casing-head gasoline, or casing-head gasoline blend. As a matter of fact, they never did find that unrefined naphtha would have been an inaccurate description of the real contents of the car. Clement undertook to say on the witness stand that he did not know very much about unrefined naphtha, but he thought it was ordinary crude oil. The witness Innes, the explosive expert of the Interstate Commerce Commission, testified that casing-head gasoline itself would not have been shipped as this was, and that it was casing-head gasoline blended with naphtha. He said he had not been familiar with the description "unrefined naphtha." We make this statement only as tending to show that the description of the contents of the car was such as to put Clement upon notice that its contents were really doubtful. But, regardless of the contents of the car according to the waybill description, those who packed it naturally knew the safe method of handling it; in other words, no matter what it was, the packers gave directions about its handling. They placed these directions on top of the dome cap, absolutely cautioning people against accidents and telling them how to avoid them. Clement, an expert, charged by the jury with knowledge of that warning, when gas pressure in the

tank is evident on all sides by spewing out at all openings, in defiance of the directions, and in apparent reckless disregard of his own safety, loosens the dome cap. The explosion came almost immediately thereafter. The jury found that the latter would not have occurred but for this act on Clement's part. Not only that, but Innes, the expert aforesaid, testified there would have been no explosion but for the loosening of the dome cap. The record contains no evidence to the contrary.

[5] Under these facts, we fail to see how a clearer case of assumption of risk could be presented. The jury, in our opinion, effectually found as a fact that Clement had assumed the risk. Here was an expert wading through instructions and in defiance thereof, he caused an explosion. Certainly, when he substituted his judgment for the directions on the dome cap, he assumed the risk thereof. Our views are sustained by the following authorities: Railway Co. v. Matthis, 101 Tex. 342, 107 S. W. 530; Railway Co. v. Hynson, 101 Tex. 543, 109 S. W. 929; Railway Co. v. Horton, 233 U. S. 492, 34 Sup. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475; Snipes v. Cotton Oil Co., 106 Tex. 181, 161 S. W. 1; Bonnet v. Railway Co., 89 Tex. 72, 33 S. W. 334; 18 R. C. L. 830; Railway Co. v. Bradford, 66 Tex. 732, 2 S. W. 595, 59 Am. Rep. 639; Powell v. Freeman, 144 S. W. 1033; Cotton Oil Co. v. Clark (Civ. App.) 126 S. W. 322; Dallas Gas Co. v. Patton (Civ. App.) 147 S. W. 313; Quinn v. Lumber Co. 103 Tex. 253, 126 S. W. 2; Magnolia Petroleum Co. v. Ray, 187 S. W. 1087.

We do not think Clement can be permitted to shut his eyes to the warning on the dome cap, violate the instructions, and not be held to have assumed the risk. The only directions ever given him by the company in handling this dome cap were in the nature of a warning not to do the very thing that he later did, with the explosion as a result. In this connection we quote as follows from the case of Bonnet v. Railway Company, 89 Tex., 72, 33 S. W. 334:

"He assumes the risk of a danger of which he has actual knowledge, and of such hazards as he would have learned by the exercise of that ordinary circumspection which a prudent man would use in the particular employment. Since, in the absence of knowledge to the contrary, he may rely upon the assumption that the master will do his duty, he is under no obligation to look out for the master's negligence; but he cannot shut his eyes to dangers that are obvious to an ordinary man, or to an experienced man if he be experienced. In Railway v. Bradford, 66 Tex. 732, the plaintiff was experienced in the work which he undertook to perform, and, though directed to do it with unsafe appliances, it was held that he could not recover. He was equally as competent as his superior to know the character and extent of the danger. To sum up: It is negligent to subject his serv-

ant to a risk not ordinarily incident to the employment, unless the extraordinary hazard be obvious to the servant, or he in some manner be apprised of it. Davidson v. Cornell, 132 N. Y. 228; Gill v. Homrighausen, 79 Wis. 634."

Again, the natural consequences of this reckless conduct on the part of Clement must be borne by him. In the case of Gas Co. v. Patton (Civ. App.) 147 S. W. 313, the court said:

"If he was reckless and did not use his senses, he must take the consequences."

In that case writ of error was denied by the Supreme Court.

Counsel for Clement realize the grave danger to their client of his act in loosening the dome cap. In answer to that contention, they state that he was working under Porter, subject to his orders, and was therefore not precluded from recovery.

It is true that, in a sense, he was working under Porter. But that is true only in so far as Porter had actually employed him and shown him the car which was in trouble. The jury found that Porter employed Clement as an expert in volatile substances to examine a leaky car and suggest remedies. It found also that he alone, or acting with Porter, loosened the dome cap. The jury nowhere found that Porter was directing the handling of the dome cap, nor is there anything in the record showing that to be true. Certainly, in the absence of any proof to the contrary, there can be no presumption that a man would employ an expert and then tell him how to do things. Such a proposition is manifestly unreasonable and at total variance with our common experience. If there were no other circumstances in the record showing that Clement was in charge of this work, the nature of his employment would, prima facie, in the absence of all proof to the contrary, so show. If Porter had only wanted an ordinary hand to do his bidding, he could and would have taken any number of his common laborers who were in the regular employ of the company. But it is unnecessary to rely upon a presumption, for all the circumstances show that Clement considered himself in charge of this undertaking. For instance, when he was first employed, he took it upon himself, without suggestion from the railway company, to bring a helper along. He gave instructions all along, and especially about the location of the engines in the yards. The last thing he did before the explosion was to direct Porter to get an engine and remove the car. We think, from all the facts, and from the jury's findings, that it cannot be said that Porter directed the loosening of the cap, or was in any way responsible for it, save as an assistant to Clement. At any rate, since Clement was found to have loosened the dome cap, it was his duty to show

that he was not responsible for his action. He did not make such showing and did not even request the submission of a special issue on that point to the jury.

But, even if Porter, another servant of the company, also assumed the risk at the same time, we know of no rule of law that would excuse Clement for his joint assumption of the risk, for there is no evidence that Porter, as yardmaster of the railway company, specifically commanded plaintiff to unscrew, or to assist in unscrewing, the dome cap, assuring him at the time that there was no danger in so doing, and that Clement relied on such assurance in acting as he did, and that he was excusably ignorant of the danger himself. None of these things were shown, and in connection with above statement we quote from the opinion of the Court of Civil Appeals on rehearing as follows:

"In 18 Ruling Case Law, p. 548, the following is said: 'Knowledge, then, or opportunity by the exercise of reasonable diligence to acquire knowledge, of the peril which subsequently results in injury to the employé, is the foundation of the liability of the employer. Liability exists when the perils of the employment are known to the employer, but not to the employé; and no liability is incurred when the employé's knowledge equals or surpasses that of the employer.'

"After a statement of the general rule, in the same authority, that an employé does not assume the risk of injury from a danger when he acts upon the command of the master, who assures him at the time that there is no danger of injury, the following is said at page 703: 'By no means, however, is an employé, under all circumstances and at all hazards, bound to obey the command or accept the assurances of the employer. The peril may be so great that no prudent person would chance it. Neither the employer nor his representative has a right to give such an order or assurance; and the employé has no right to act pursuant thereto; and if the employé receive an injury, knowing as well as the employer the danger to which he exposes himself, he will not be permitted to recover. The fundamental inquiry here, as elsewhere, involves the comparative knowledge of the parties. The fact that the employé acted pursuant to an immediate command is a cogent evidentiary fact bearing on this issue. Inasmuch as commands usually proceed from persons having superior knowledge it may be presumed in case an employé is ordered to do certain work, that the employer has superior knowledge of the perils attending performance; and in the absence of anything to the contrary or where the case otherwise is in doubt this presumption must prevail in behalf of the plaintiff. But, where the evidence does not leave the fact of knowledge on the part of the employé a matter of conjecture and doubt, the presumption is unavailing.'

"Such cases as M., K. & T. Ry. Co. v. Hamilton, 30 S. W. 679, Alamo Oil & Refining Co. v. Curvier, 136 S. W. 1132, and Lone Star Lignite Mining Co. v. Caddell (Civ App.) 134 S. W. 841, cited by plaintiff in support of his motion for rehearing, are not in conflict with the quotations from Ruling Case Law shown above, but are in harmony with them."

We are inclined to think the Court of Civil Appeals, in the quotation just above given, were correct. At any rate, Clement's knowledge as an expert was superior to that of Porter, and he had the same opportunity to read the caution card and know the danger of loosening the dome cap.

In any event, Clement was nothing more than a special employé, hired as an expert to remedy a serious, or unusual condition. The record discloses that the railway company did nothing whatever after his employment and after he took charge of his task which added any hazard to his employment. As we construe the findings of the jury, and in the light of the undisputed evidence, the sole proximate cause of Clement's injuries was his own negligent act in loosening the dome cap, when he had been warned not to do so. He exercised his own judgment and himself brought about the disastrous conditions. Therefore we cannot feel that he is entitled to recover. This principle of law is well established by the following authorities which construed the federal Employers' Liability Act, which act is applicable to the case at bar: Pankey v. A. T. & S. F., 180 Mo. App. 185, 168 S. W. 274; Ellis, Adm'r, v. L. H. & N. St. L. Ry. Co., 155 Ky. 745, 160 S. W. 512; Reese v. Philadelphia, etc., Railroad Co., 239 U. S. 463, 36 Sup. Ct. 134, 60 L. Ed. 384; Great Northern Railroad v. Wiles, 240 U. S. 444, 36 Sup. Ct. 406, 60 L. Ed. 732; Southern Railway v. Gray, 241 U. S. 333, 36 Sup. Ct. 558, 60 L. Ed. 1030.

The Court of Civil Appeals in this case has given us the benefit of exceptionally able opinions by Justice Dunklin, both originally and on rehearing. We think that court has correctly disposed of this case, and we recommend that its judgment be affirmed.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.